# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 Cases |
| | ) | |
| GW Limited 51, Inc., f/k/a GWLS | ) | Case No. 08-12430 (PJW) |
| Holdings, Inc., et al.,[1] | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |

## DISCLOSURE STATEMENT FOR JOINT LIQUIDATING PLAN OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OF THE JOINT LIQUIDATING PLAN OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, DATED AUGUST 19, 2009. ACCEPTANCES OR REJECTIONS OF SUCH PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE COURT. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT.**

| | |
|---|---|
| **Willkie Farr & Gallagher LLP** | **Young Conaway Stargatt & Taylor, LLP** |
| 787 Seventh Avenue | The Brandywine Building |
| New York, New York 10019-6099 | 1000 West Street, 17th Floor |
| (212) 728-8000 | P.O. Box 391 |
| | Wilmington, Delaware 19899-0391 |
| | (302) 571-6600 |

Co-Counsel to the Debtors and Debtors in Possession

---

[1] This Disclosure Statement and the proposed Plan relate to the following debtors and debtors in possession: (i) GW Limited 14, LLC; (ii) GW Limited 16, LLC; (iii) GW Limited 15, Inc.; (iv) GW Limited 38, LLC; (v) GW Limited 46, LLC; (vi) GW Limited 47, LLC; (vii) GW Limited 48, LLC; (viii) GW Limited 45, LLC; (ix) GW Limited 44, LLC; (x) GW Limited 43, LLC; (xi) GW Limited 26, Ltd.; (xii) GW Limited 28, Ltd.; (xiii) GW Limited 27, Ltd; (xiv) GW Limited 9, L.P.; (xv) GW Limited 20, Inc.; (xvi) GW Limited 35, Inc.; (xvii) GW Limited 19, LLC; (xviii) GW Limited 18, Inc.; (xix) GW Limited 39, LLC; (xx) GW Limited 24, Ltd.; (xxi) GW Limited 49, LLC; (xxii) GW Limited 50, LLC; (xxiii) GW Limited 36, Inc.; (xxiv) GW Limited 37, Inc.; (xxv) GW Limited 8, Inc.; (xxvi) GW Limited 17, Inc.; (xxvii) GW Limited 7, L.P.; (xxviii) GW Limited 1, Inc.; (xxix) GW Limited 10, LLC; (xxx) GW Limited 21, Inc.; (xxxi) GW Limited 40, LLC; (xxxii) GW Limited 23, Ltd.; (xxxiii) GW Limited 51, Inc.; (xxxiv) GW Limited 22, LLC; (xxxv) GW Limited 42, LLC; (xxxvi) GW Limited 31, Inc.; (xxxvii) GW Limited 30, LLC; (xxxviii) GW Limited 12, Inc.; (xxxix) GW Limited 25, Inc.; (xl) GW Limited 11, Inc.; (xli) GW Limited 4, LLC; (xlii) GW Limited 6, LLC; (xliii) GW Limited 13, LLC; (xliv) GW Limited 34, LLC; (xlv) GW Limited 3, LLC; (xlvi) GW Limited 32, Inc.; (xlvii) GW Limited 33, LLC; (xlviii) GW Limited 41, LLC; (xlix) GW Limited 29, LLC; (l) GW Limited 2, L.P.; and (li) GW Limited 5, L.P (collectively, the "Debtors"). On February 20, 2009, a sale of substantially all of the Debtors assets closed, and in connection with such sale, the names of the Debtor entities were changed. A list of the Debtors' original names can be found in the Order Modifying the Order Authorizing Joint Administration Pursuant to Rule 1015 of the Federal Rules of Bankruptcy Procedure entered by this Court.

**Pepper Hamilton, LLP**
1313 Marker Street, Suite 5100
P.O. Box 1709
Wilmington, DE 19899
(302) 777-6566

Co-Counsel to the Official Committee
of Unsecured Creditors

**Otterbourg, Steindler, Houtson &
Rosen, P.C.**
230 Park Avenue
New York, New York 10169
(212) 661-9100

# TABLE OF CONTENTS

**Page**

ARTICLE 1  INTRODUCTION ..................................................................2

ARTICLE 2  Summary of Classifications ...................................................2

ARTICLE 3  Voting And Confirmation Procedures .................................7

3.1  General...............................................................................................7

3.2  Holders of Claims Entitled to Vote.................................................8

3.3  Solicitation Package.........................................................................8

3.4  Voting Procedures............................................................................8

3.5  Confirmation Hearing and Deadline For Objections to Confirmation .................10

3.6  Recommendations...........................................................................11

ARTICLE 4  BACKGROUND AND EVENTS PRECIPITATING THE CHAPTER 11 FILING ...........................................................12

4.1  Introduction.....................................................................................12

4.2  Events Leading to the Chapter 11 Filing .....................................16

ARTICLE 5  SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE ..................17

5.1  Commencement of the Chapter 11 Cases .....................................17

5.2  First Day Orders.............................................................................18

5.3  DIP Financing ................................................................................18

5.4  Appointment of Official Unsecured Creditors' Committee..................................18

5.5  The Sale of Substantially All of the Debtors' Assets .................18

5.6  The Stipulation Settling the Committee's Objection to the Sale ..........................19

5.7  Rejection/Assumption of Executory Contracts and Unexpired Leases ...............20

5.8  Procedures for Settlement and Payment of Certain Claims Covered by Insurance ................20

5.9  Authorization and Approval of Entry into the ACE Insurance Program...............21

5.10  Case Administration........................................................................21

5.11  Claims ............................................................................................22

ARTICLE 6  Treatment of Claims and Equity Interests Under the Plan ............................22

6.1  Treatment of Unclassified Claims Under the Plan .....................22

6.2  Class 1 - Other Priority Claims.....................................................23

i

6.3    Class 2 - Secured Tax Claims .................................................................24

6.4    Class 3 - Other Secured Claims ..............................................................24

6.5    Class 4 - First Lien Credit Agreement Claims........................................25

6.6    Class 5 - General Unsecured Claims .......................................................25

6.7    Class 6 - Insurance Claims......................................................................26

6.8    Class 7 - Equity Interests in GWLS ........................................................26

ARTICLE 7        IMPLEMENTATION OF THE PLAN .........................................27

7.1    Substantive Consolidation ......................................................................27

7.2    Continued Corporate Existence ..............................................................28

7.3    Assumed Liabilities ................................................................................29

7.4    Cancellation of Existing Securities and Agreements..............................29

7.5    Post-Confirmation Oversight Committee ................................................29

7.6    Conditions to Confirmation and Consummation ....................................30

ARTICLE 8        DISBURSEMENTS UNDER THE PLAN.......................................31

8.1    Disbursements Under the Plan.................................................................31

ARTICLE 9        EFFECT OF CONFIRMATION ..................................................34

9.1    Binding Effect.........................................................................................34

9.2    Vesting of Assets ....................................................................................34

9.3    Discharge of the Debtors and of Claims and Termination of Equity
       Interests...................................................................................................35

9.4    Term of Pre-Confirmation Injunctions or Stays ....................................35

9.5    Injunction Against Interference with Plan ..............................................35

9.6    Injunction ................................................................................................35

9.7    Releases...................................................................................................36

9.8    Exculpation .............................................................................................39

9.9    Injunction ................................................................................................39

9.10   Release of Liens and Encumbrances........................................................39

ARTICLE 10      EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......41

| | | |
|---|---|---|
| 10.1 | Assumption or Rejection of Executory Contracts and Unexpired Leases | 41 |
| 10.2 | Cure of Defaults | 41 |
| 10.3 | Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan | 42 |
| ARTICLE 11 | ACCEPTANCE AND CONFIRMATION OF THE PLAN | 42 |
| 11.1 | Introduction | 42 |
| 11.2 | Acceptance of the Plan | 43 |
| 11.3 | Confirmation and Consummation | 43 |
| 11.4 | Amendment or Modification of the Plan | 47 |
| 11.5 | Revocation or Withdrawal of the Plan | 48 |
| ARTICLE 12 | THE CONTINUED EXISTENCE OF THE DEBTORS | 48 |
| 12.1 | The Plan Administrator | 48 |
| 12.2 | Procedures for Treating Disputed Claims | 50 |
| 12.3 | Post-Confirmation Jurisdiction of the Court | 51 |
| ARTICLE 13 | CERTAIN RISK FACTORS TO BE CONSIDERED | 53 |
| 13.1 | Risk that Distributions will be Less Than Estimated by Debtors | 53 |
| 13.2 | Litigation Risks | 54 |
| 13.3 | Bankruptcy Risks | 54 |
| ARTICLE 14 | CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES | 55 |
| 14.1 | Federal Income Tax Consequences to the Debtors | 56 |
| 14.2 | Federal Income Tax Consequences to Holders of Claims | 57 |
| ARTICLE 15 | ALTERNATIVES TO PLAN AND CONSEQUENCES OF REJECTION | 59 |
| ARTICLE 16 | GENERAL PROVISIONS | 60 |
| 16.1 | Exemption from Transfer Taxes | 60 |
| 16.2 | Payment of Statutory Fees | 60 |
| 16.3 | Post-Effective Date Fees and Expenses | 60 |
| 16.4 | Plan Supplement | 60 |
| 16.5 | Confirmation Order | 61 |

**Page**

16.6    Severability ...................................................................................................61

16.7    Expedited Tax Determination .........................................................................61

16.8    Governing Law ...............................................................................................61

16.9    Binding Effect.................................................................................................61

16.10   Exhibits/Schedules..........................................................................................61

16.11   Dissolution of the Committee .........................................................................62

16.12   Notices ............................................................................................................62

ARTICLE 17        CONCLUSION.................................................................................64

## INDEX OF EXHIBITS

EXHIBIT A    The Plan

EXHIBIT B    Liquidation Analysis

EXHIBIT C    Purchase Agreement

THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING THE JOINT LIQUIDATING PLAN OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, DATED AUGUST 19, 2009 (AS MAY BE AMENDED, THE "PLAN"). NO REPRESENTATIONS HAVE BEEN AUTHORIZED BY THE COURT CONCERNING THE DEBTORS OR THE VALUE OF THEIR ASSETS, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN, BUT TO AID AND SUPPLEMENT SUCH REVIEW. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN (WHICH IS INCLUDED AS EXHIBIT A TO THIS DISCLOSURE STATEMENT). IN THE EVENT OF A CONFLICT BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN GOVERN ALL HOLDERS OF CLAIMS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS ANNEXED HERETO, BEFORE DECIDING HOW TO VOTE WITH RESPECT TO THE PLAN.

THE DEBTORS AND THE COMMITTEE RESERVE THE RIGHT TO FILE AN AMENDED PLAN AND DISCLOSURE STATEMENT FROM TIME TO TIME. THE DEBTORS AND COMMITTEE URGE YOU TO READ THIS DISCLOSURE STATEMENT CAREFULLY FOR A DISCUSSION OF VOTING INSTRUCTIONS, RECOVERY INFORMATION, CLASSIFICATION OF CLAIMS, THE HISTORY OF THE DEBTORS AND THE CHAPTER 11 CASES, AND A SUMMARY AND ANALYSIS OF THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH SUCH HOLDER SHOULD, THEREFORE, CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

# ARTICLE 1
## INTRODUCTION

On October 20, 2008 (the "Petition Date"), the above-captioned debtors (the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. This Disclosure Statement and the accompanying Plan relate to GW Limited 51, Inc., f/k/a GWLS Holdings, Inc. ("GWLS") and each of its debtor affiliates. These chapter 11 cases have been procedurally consolidated and are being jointly administered, with the Debtors managing their affairs in the ordinary course as debtors in possession, subject to the control and supervision of the Court. On October 30, 2008, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Committee.

The Debtors and the Committee submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of acceptances of the Plan, a copy of which is annexed hereto as Exhibit A.

Capitalized terms used and not defined herein have the meanings ascribed to such terms in the Plan unless the context requires otherwise.

[The Court has approved this Disclosure Statement as containing "adequate information" in accordance with section 1125(b) of the Bankruptcy Code to enable a hypothetical, reasonable investor in each of the relevant Classes to make an informed judgment about the Plan.]

The Plan contemplates and is predicated upon the substantive consolidation of the Debtors. For a detailed discussion of the Substantive Consolidation of these cases proposed under the Plan, see Section 7.1 ("*Substantive Consolidation*") below.

# ARTICLE 2
## SUMMARY OF CLASSIFICATIONS

The following tables set forth a brief summary of the classification and treatment of Claims and Equity Interests and the consideration distributable to the holders of such Claims and Equity Interests under the Plan. The information set forth in the tables is for convenience of reference only. Each holder of a Claim or Interest should refer to Articles III and IV of the Plan and the liquidation analysis annexed as Exhibit B hereto for a full understanding of the classification and treatment of Claims and Equity Interests provided under the Plan. **THE ESTIMATES SET FORTH IN THESE TABLES MAY DIFFER FROM ACTUAL DISTRIBUTIONS BY REASON OF, AMONG OTHER THINGS, VARIATIONS IN THE ASSERTED OR ESTIMATED AMOUNTS OF ALLOWED CLAIMS AND THE EXISTENCE OF DISPUTED CLAIMS. STATEMENTS REGARDING PROJECTED AMOUNTS OF CLAIMS OR DISTRIBUTIONS (OR THE VALUE OF SUCH DISTRIBUTIONS) ARE ESTIMATES BY THE DEBTORS AND THE COMMITTEE BASED ON CURRENT INFORMATION AND ARE NOT REPRESENTATIONS AS TO THE ACCURACY OF THESE AMOUNTS.** Unless otherwise noted, these estimates are as of

August 19, 2009.  For an explanation of the basis for the limitations and uncertainties regarding these calculations, see Article 13 ("*Certain Risk Factors to Be Considered*") below.

| UNIMPAIRED CLASSES OF CLAIMS: | | | | |
|---|---|---|---|---|
| **CLASS** | **TYPE OF CLAIM OR STOCK INTEREST** | **ESTIMATED ALLOWABLE AMOUNT** | **ESTIMATED RECOVERY AMOUNT** | **TREATMENT UNDER THE PLAN** |
| Unclassified | Administrative Expense Claims | $[____] | 100% | Each holder of an Allowed Administrative Expense Claim will be paid 100% of the unpaid allowed amount of such Claim in Cash on the Distribution Date. Notwithstanding the immediately preceding sentence: (a) Administrative Expense Claims that are also Fee Claims will be governed according to the applicable sections addressing Fee Claims (described below); (b) Administrative Expense Claims that are Assumed Liabilities have been Assumed and shall be satisfied in accordance with the Purchase Agreement and shall not be an Obligation of the Debtors or Reorganized Debtor; and (c) except to the extent provided in the preceding clause (b), Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors or liabilities arising under loans or advances to or other obligations incurred by the Debtors shall be paid in full and performed by the Reorganized Debtor in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions. Notwithstanding the foregoing, the holder of an Allowed Administrative Expense Claim may receive such other, less favorable treatment as may be agreed upon by the parties. |
| Unclassified | Fee Claims | $[____] | 100% | Each holder of an Allowed Fee Claim will receive 100% of the unpaid amount of such Allowed Fee Claim in Cash no later than: (a) five (5) Business Days after the date an order is entered awarding such Allowed Fee Claim; or (b) upon such other terms as may be mutually agreed upon between such holder of a Fee Claim and the Reorganized Debtor. |
| Unclassified | Priority Tax Claims | $0 | 100% | Each holder of an Allowed Priority Tax Claim will receive, except to the extent that such holder has been paid by the Debtors prior to the Effective Date 100% of the unpaid Allowed amount of such Claim in Cash on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed |

| UNIMPAIRED CLASSES OF CLAIMS: | | | | |
|---|---|---|---|---|
| CLASS | TYPE OF CLAIM OR STOCK INTEREST | ESTIMATED ALLOWABLE AMOUNT | ESTIMATED RECOVERY AMOUNT | TREATMENT UNDER THE PLAN |
| | | | | Priority Tax Claim, or as soon thereafter as is practicable. Notwithstanding the foregoing, the holder of an Allowed Priority Tax Claim may receive such other, less favorable treatment as may be agreed upon by the parties. |
| 1 | Other Priority Claims | $[___] | 100% | Each holder of an Allowed Other Priority Claim will receive 100% of the unpaid Allowed amount of such Claim in Cash on the later of the Effective Date and the date such Allowed Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as is practicable. Notwithstanding the foregoing, the holder of an Allowed Other Priority Claim may receive such other, less favorable treatment as may be agreed upon by the parties. |
| 2 | Secured Tax Claims | $[___] | 100% | Each holder of an Allowed Secured Tax Claim will receive, 100% of the unpaid allowed amount of such Secured Tax Claim in Cash on the later of the Effective Date and the date such Secured Tax Claim becomes an Allowed Secured Tax Claim, or as soon thereafter as is practicable. Notwithstanding the foregoing, the holder of an Allowed Secured Tax Claim may receive such other, less favorable treatment as may be agreed upon by the parties. |
| 3 | Other Secured Claims | $[___] | 100% | Each holder of an Allowed Other Secured Claim shall receive: (i) 100% of the unpaid Allowed amount of such Other Secured Claim in Cash on the later of the Effective Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable; or (ii) such other treatment that leaves such Allowed Other Secured Claim unimpaired pursuant to section 1124(2) of the Bankruptcy Code. |

| IMPAIRED CLASSES OF CLAIMS AND INTERESTS: | | | | |
|---|---|---|---|---|
| CLASS | TYPE OF CLAIM OR STOCK INTEREST | ESTIMATED ALLOWABLE AMOUNT | ESTIMATED RECOVERY AMOUNT | TREATMENT UNDER THE PLAN |
| 4 | First Lien Credit Agreement Claims | $38,151,689.20 | N/A | Pursuant to the 9019 Settlement, the holders of Allowed First Lien Credit Agreement Claims shall not receive any distributions on account of such claims. Notwithstanding the preceding sentence: (a) if none of the Second Lien Lenders object to the Plan or the Disclosure Statement, and the Confirmation Date and the Effective Date occurs, the Deficiency Claim shall be waived for all purposes in the Chapter 11 Cases; and (b) if any of the Second Lien Lenders object to the Plan or the Disclosure Statement, the Deficiency Claim shall not be waived and any amounts recovered on account of the Deficiency Claim shall be added to the Unsecured Give-up Fund for the benefit of Eligible Unsecured Creditors and paid directly by the Debtors to the Unsecured Creditor Trustee; provided, however, in such event, the Second Lien Lenders shall not be entitled to participate in the Unsecured Give-up Fund. |
| 5 | General Unsecured Claims | $[___] | 0.6% | Each holder of an Allowed General Unsecured Claim as of the Distribution Record Date shall be entitled to receive its Pro Rata share of the Class 5 Distribution. |
| 6 | Insurance Claims | $[___] | 100% | Each holder of an Allowed Insurance Claim shall be entitled to receive Cash, solely from the proceeds of the insurance policies issued to the Debtors, at such time as the Insurance Claim becomes an Allowed Insurance Claim. In no event shall the holder of a Insurance Claim be entitled to recover on such Claim from any assets of the Debtors or the Reorganized Debtor other than from the insurance policies issued to the Debtors, and shall not otherwise have any recourse against the Debtors, Reorganized Debtor or any current or former employee of the Debtors. Holders of Insurance Claims that did not timely file proofs of Claim or have their Insurance Claims deemed to be timely and Allowed Insurance Claims by Final Order of the Bankruptcy Court shall not be entitled to any recovery under the Plan or from any of the Debtors' insurers. |
| 7 | Equity Interests in GWLS | Not Applicable | 0% | The holders of Equity Interests in GWLS shall not receive any distributions on account of such interests. On the Effective Date, all Equity Interests in GWLS shall be cancelled. |

## ARTICLE 3
## VOTING AND CONFIRMATION PROCEDURES

**3.1** <u>General</u>

On _____, 2009, the Court approved this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable the holders of Claims against the Debtors to make an informed judgment with respect to acceptance or rejection of the Plan. THE COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE PLAN BY THE COURT.

WHEN AND IF CONFIRMED BY THE COURT AND CONSUMMATED THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, WHETHER OR NOT THEY ARE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN. THUS, ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN. This Disclosure Statement contains important information about the Plan and considerations pertinent to acceptance or rejection of the Plan, and developments concerning the Chapter 11 Cases.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS, AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS. EXCEPT WITH RESPECT TO THE CONDITIONS TO CONFIRMATION AND CONSUMMATION OF THE PLAN, AND EXCEPT AS OTHERWISE SPECIFICALLY AND EXPRESSLY STATED HEREIN, THIS DISCLOSURE STATEMENT DOES NOT REFLECT ANY EVENTS THAT MAY OCCUR SUBSEQUENT TO THE DATE HEREOF AND THAT MAY HAVE A MATERIAL IMPACT ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. FURTHER, THE DEBTORS AND COMMITTEE DO NOT ANTICIPATE THAT ANY AMENDMENTS OR SUPPLEMENTS TO THIS DISCLOSURE STATEMENT WILL BE DISTRIBUTED TO REFLECT SUCH OCCURRENCES. THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT UNDER ANY CIRCUMSTANCES IMPLY THAT THE INFORMATION HEREIN IS CORRECT OR COMPLETE AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT.

### 3.2    Holders of Claims Entitled to Vote

With respect to Claims in Classes that are "impaired" (as defined below) under, but not deemed to reject, the Plan, each holder of a Claim in such a Class will receive this Disclosure Statement and a Ballot for the acceptance or rejection of the Plan and other related voting materials. Any creditor or interest holder whose legal, contractual or equitable rights are altered, modified or changed by the proposed treatment under the Plan or whose treatment under the Plan is not provided for in section 1124 of the Bankruptcy Code is considered "impaired."

Under the Plan, holders of Allowed Claims in Classes 4, 5 and 6 (the "Voting Classes") are impaired and entitled to vote on the Plan. Holders of Allowed Claims in Classes 1, 2, and 3 are unimpaired under the Plan and are deemed to have accepted the Plan. Finally, holders of Equity Interests in GWLS, in Class 7, who will receive no distribution under the Plan, are deemed to have rejected the Plan. For a description of the Classes of Claims and Interests and their treatment under the Plan, see Article 6 below.

### 3.3    Solicitation Package

If you are the holder of a Claim in a Voting Class, this Disclosure Statement, the attached exhibits, the Plan, and the Plan Supplement are the only materials you should use in determining how to vote.

If you are the holder of a Claim in a Voting Class, accompanying this Disclosure Statement are copies of (i) the Plan, (ii) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time and place of the hearing to consider the confirmation of the Plan and related matters, and the time for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice"), (iii) the order of the Court, dated _____, 2009 (the "Disclosure Statement Order"), which, among other things, approves the Disclosure Statement and establishes certain procedures with respect to the solicitation and tabulation of votes to accept or to reject the Plan, (iv) a letter from the Committee in support of the Plan, and, if applicable (v) one or more Ballots (and return envelopes) that you may use in voting to accept or to reject the Plan (the "Solicitation Package").

Each Ballot has been designated for a specific Class of Claims. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement. If you hold Claims in more than one Class you must use a separate ballot for voting with respect to each Class of Claims you hold.

If you did not receive a Ballot in your package and believe that you should have, you believe you received the wrong Ballot, or you have any questions concerning the form of ballot please contact Kurtzman Carson Consultants LLC (the "Voting Agent") at the address or telephone number set forth below.

### 3.4    Voting Procedures

**THE COURT HAS FIXED 5:00 P.M. (PREVAILING EASTERN TIME) ON _____, 2009 AS THE "VOTING RECORD DATE." ONLY PERSONS WHO HOLD CLAIMS ON THE VOTING RECORD DATE ARE ENTITLED TO RECEIVE A COPY**

**OF THIS DISCLOSURE STATEMENT AND RELATED MATERIALS. ONLY PERSONS WHO HOLD CLAIMS THAT ARE IMPAIRED UNDER THE PLAN AND ARE NOT DEEMED TO HAVE REJECTED THE PLAN ARE ENTITLED TO VOTE WHETHER TO ACCEPT OR REJECT THE PLAN.**

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions on the enclosed Ballot, please indicate your acceptance or rejection of the Plan by checking the appropriate box on the Ballot. Complete and sign your Ballot and return it in the envelope provided so that it is *RECEIVED* by the Voting Deadline.

All correspondence in connection with voting on the Plan should be directed to the Voting Agent at the address below.

FOR YOUR VOTE TO BE COUNTED, YOU MUST PROPERLY COMPLETE AND MAIL YOUR BALLOT SO THAT YOUR VOTE IS *RECEIVED* BY THE VOTING AGENT NO LATER THAN THE VOTING RECORD DATE. IF YOU HAVE BEEN INSTRUCTED TO RETURN YOUR BALLOT TO YOUR BANK, BROKER, PROXY INTERMEDIARY OR OTHER NOMINEE, PLEASE ALLOW ADDITIONAL TIME. **DO NOT RETURN DEBT INSTRUMENTS WITH YOUR BALLOT.**

If you have any questions about the voting procedures or the Solicitation Package, please contact the Voting Agent at the following addresses and phone number:

> Kurtzman Carson Consultants LLC
> 2335 Alaska Ave.
> El Segundo, CA 90245
> (888) 249-2670 (between the hours of 9:00 a.m. and 5:00 p.m. (prevailing Pacific Time), Monday through Friday)

You may obtain additional copies of the Plan, Disclosure Statement or other material in the Solicitation Package from the Voting Agent.

ALL PROPERLY COMPLETED BALLOTS RECEIVED BY THE VOTING AGENT PRIOR TO 4:00 P.M. (PREVAILING EASTERN TIME) ON _____, 2009 (THE "VOTING DEADLINE"), WILL BE COUNTED FOR PURPOSES OF DETERMINING WHETHER EACH CLASS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN HAS ACCEPTED THE PLAN. ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED NOR WILL ANY BALLOTS RECEIVED BY FACSIMILE BE ACCEPTED. The Voting Agent will prepare and file with the Court a certification of the results of the balloting with respect to the Plan on a Class-by-Class basis.

In accordance with Bankruptcy Rule 3017(d), to the extent appropriate, the Debtors and Committee will send Ballots to transfer agents, registrars, servicing agents, or other intermediaries holding Claims for or acting on behalf of record holders of Claims (collectively, the "Intermediaries"). Each Intermediary shall be entitled to receive, upon request of the Debtors by _____, 2009, reasonably sufficient copies of Ballots to distribute to the beneficial owners of the Claims for which it is an Intermediary, and the Debtors shall be responsible for and pay

each such Intermediary's reasonable costs and expenses associated with the distribution of copies of Ballots to the beneficial owners of such Claims and tabulation of the Ballots. Additionally, each Intermediary shall receive returned Ballots and shall tabulate and return the results to the appropriate Voting Agent in a summary ballot by the Voting Deadline, indicating the number and dollar amount of cast Ballots in the group of claimants for which it is an Intermediary. The Intermediaries must certify that each beneficial holder has not cast more than one vote for any purpose, including numerosity and Claim amount, even if such holder holds securities of the same type in more than one account.

**IF YOUR VOTE IS BEING PROCESSED BY AN INTERMEDIARY, PLEASE ALLOW TIME FOR TRANSMISSION OF YOUR BALLOT TO SUCH INTERMEDIARY AND FROM THE INTERMEDIARY TO THE VOTING AGENT BEFORE THE VOTING DEADLINE. IF YOU HAVE A QUESTION CONCERNING THE VOTING PROCEDURE, CONTACT THE APPLICABLE INTERMEDIARY. DO NOT RETURN YOUR SECURITIES WITH YOUR BALLOTS.**

**HOLDERS OF EQUITY INTERESTS IN GWLS WILL NOT BE ENTITLED TO RECEIVE ANY DISTRIBUTION UNDER THE PLAN. SUCH EQUITY INTERESTS WILL BE CANCELLED PURSUANT TO THE PLAN. ACCORDINGLY, SUCH HOLDERS ARE DEEMED TO REJECT THE PLAN AND WILL NOT BE ENTITLED TO VOTE THEREON.**

**Your vote on the Plan is important. The Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each class that is impaired under such plan vote to accept such plan, unless the "cram down" provisions of the Bankruptcy Code are employed with respect to such class. The Debtors and Committee have reserved their rights to seek to "cram down" the Plan on certain non-accepting Classes of creditors and interest holders. See Section 11.3(d) ("*Cram Down*") below. In addition, under the Bankruptcy Code, only the votes of those holders of claims or interests who actually submit votes on a plan are counted in determining whether specific majorities of votes in favor of the plan have been received. If you are eligible to vote with respect to a Claim and do not deliver a properly completed ballot relating to that Claim by the Voting Deadline, you will be deemed to have abstained from voting with respect to that Claim and your eligibility to vote with respect to that Claim will not be considered in determining the number and dollar amount of ballots needed to make up the specified majority of that Claim's Class for the purpose of approving the Plan.**

### 3.5 Confirmation Hearing and Deadline For Objections to Confirmation

**Pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Bankruptcy Court has scheduled a hearing on confirmation of the Plan (the "Confirmation Hearing") commencing at __:__ _.m. (prevailing New York City time), on _____, 2009, at the United States Courthouse, 824 North Market Street, 6th Floor, Courtroom 2, Wilmington, Delaware 19801, before the Honorable Peter J. Walsh.** The Confirmation Hearing may be adjourned from time to time by the Court without further notice other than by announcement in the Bankruptcy Court on the scheduled date of such hearing or by notice of agenda sent to parties entitled to receipt thereof. At the Confirmation Hearing, the Bankruptcy

Court will: (i) determine whether the requisite vote has been obtained for each of the Voting Classes (each as defined herein); (ii) hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously disposed of; (iii) determine whether the Plan meets the confirmation requirements of the Bankruptcy Code; and (iv) determine whether to confirm the Plan.

Any objection to confirmation of the Plan must be in writing and filed and served as required by the Bankruptcy Court pursuant to the order approving the Disclosure Statement, a copy of which accompanies this Disclosure Statement. Specifically, all objections to the confirmation of the Plan must be served in a manner so as to be *RECEIVED* on or before _____, 2009 at _____ (New York City time) by: (i) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2313, Wilmington, Delaware 19801, Attn: David Klauder, Esq.; (ii), Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019, Attn.: Paul V. Shalhoub, Esq. and Robin Spigel, Esq., co-counsel for the Debtors; (iii) Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, Delaware 19801, Attn: Robert S. Brady, Esq. and Matthew B. Lunn, Esq., co-counsel for the Debtors; (iv) (a) Paul Hastings Janofsky & Walker LLP, Park Avenue Tower, 75 E. 55th Street, First Floor, New York, NY 10022, Attn: Kristine M. Shryock, Esq., and (b) Paul Hastings Janofsky & Walker LLP, 600 Peachtree Street, NE, Suite 2400, Atlanta, GA 30308, Attn: Jesse H. Austin, III, Esq., and (c) Duane Morris LLP, Suite 1200, 1100 North Market Street, Wilmington, DE 19801, Attn: Richard W. Riley, Esq., counsel to the DIP Administrative Agent; (v) the Office of the United States Trustee, 844 King Street, Room 2313, Wilmington, Delaware 19801, Attn: David Klauder, Esq.; and (vi) (a) Otterbourg, Steindler, Houston & Rosen, P.C., 230 Park Avenue, New York, New York 10169, Attn: Jenette A. Barrow-Bosshart, Esq. and Melanie L. Cyganowski, Esq., and (b) Pepper Hamilton LLP, 1313 N. Market Street, Wilmington, Delaware 19801, Attn: David B. Stratton, Esq., co-counsel to the Official Committee of Unsecured Creditors.

### 3.6 Recommendations

**BOTH THE DEBTORS AND THE COMMITTEE BELIEVE THE TREATMENT OF HOLDERS OF CLAIMS IN THE IMPAIRED CLASSES ELIGIBLE TO VOTE WILL RECEIVE A GREATER RECOVERY FOR SUCH HOLDERS THAN WOULD BE AVAILABLE IN A CHAPTER 7 LIQUIDATION. SEE THE LIQUIDATION ANALYSIS ANNEXED HERETO AS EXHIBIT B. ACCORDINGLY, THE DEBTORS AND COMMITTEE BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF HOLDERS OF CLAIMS IN SUCH CLASSES, AND RECOMMEND THAT ALL HOLDERS OF CLAIMS IN THE IMPAIRED CLASSES ENTITLED TO DO SO VOTE TO ACCEPT THE PLAN.**

# ARTICLE 4
## BACKGROUND AND EVENTS PRECIPITATING THE CHAPTER 11 FILING

### 4.1     Introduction

#### (a)     Summary of Operations Prior to Sale of Substantially All of the Debtors' Assets

Prior to the sale of substantially all of the Debtors' assets, which is explained below, the Debtors were non-asset based logistics providers focused on ground transportation and related services within the trucking and third-party logistics markets in the United States. The Debtors offered a suite of transportation and logistics services, including dedicated and agent-based truckload solutions, warehouse-based contract logistics, and freight brokerage services. The Debtors provided their services primarily through a non-asset based business model that utilized approximately 6,000 independent contractor owner-operators, approximately 20,000 independent third-party carriers, as well as approximately 380 independent commissions-based sales agents, The Debtors also employed approximately 2,935 full-time and 116 part-time employees. The Debtors' executive offices were located in Dallas, Texas, and they had logistics and warehouse facilities throughout the United States.

The Debtors operated through four (4) primary lines of business: (i) "Dedicated Transport," which primarily provided dedicated "closed loop" truckload transportation focused on the food staple industry mainly using independent contractor owner-operators; (ii) "Truckload Management," which provided irregular-route, small business, agent-based truckload freight transportation mainly using independent contractor owner-operators; (iii) "Freight Brokerage," which matched customer shipments with third-party carriers for pick-up and delivery; and (iv) "Distribution Logistics," which primarily provided warehouse-based contract logistics services. The Debtors had relationships with customers in numerous industries, including food and beverage, retail, fast-moving consumer packaged goods, and a variety of industrial products.

#### (i)     Dedicated Transport

The Dedicated Transport ("DT") business managed the outbound and inbound delivery of products at customers' distribution centers and offered customized and exclusive distribution and re-supply services between its customers' distribution centers and individual retail stores.

DT services were provided through a largely non-asset based model that utilized a network of approximately 3,150 independent owner-operators, 800 company drivers and 2,200 third-party carriers. Dedicated contract carriage was provided to customers through customer-owned or leased distribution centers. The Debtors also operated approximately 4,900 trailers, of which 70% were protected by a "put" provision (i.e., the Debtors could cause their customers to purchase a trailer on certain terms and conditions).

DT was the largest primarily non-asset based dedicated contract carriage provider in the United States. The Debtors also were the largest provider of dedicated contract carriage for the grocery industry among both asset based and non-asset based carriage providers, and provided dedicated contract carriage to the food and beverage, retail, garment, and general merchandise

industries. DT service contracts typically contained three to five-year terms and include escalators for fuel prices and other specified costs.

DT's revenues comprised approximately 51% of the Debtors' total annual revenues.

### (ii)    Truckload Management

The Truckload Management ("TM") business provided non-asset based truckload management services to independent agents and customers throughout the United States. Generally, TM acted as a back-office provider and "licensed carrier" for a network of independent sales agents who source freight shipments and acted as the primary interface with customers. The independent sales agents placed freight shipments on, among others: (a) the agent's own trucks; (b) trucks owned by independent contractor owner-operators; or (c) independent third-party carriers through brokerage arrangements. TM had a network of approximately 380 local independent sales agents, 1,600 independent owner-operators, and 8,000 independent third-party carriers.

TM contracts were typically exclusive arrangements with the independent sales agents who were paid a commission ranging between 8-10% of revenue on fulfilled orders for truckline freight moved on TM's operating license. To attract an agent's business, TM provided the agent with a variety of services including billing, collections, contractor settlements, management information systems, purchasing, safety resources, risk management, and regulatory compliance.

TM provided a broad range of truckload transportation options, including, utilizing flatbed, specialized, dry vans, and temperature-controlled transport. TM provided transportation services to customers in a broad range of industries, including food and beverage, consumer, manufacturing/industrial, retail, transportation, aluminum, and government.

TM's revenues comprised approximately 28% of the Debtors' total annual revenues.

### (iii)    Freight Brokerage

The Freight Brokerage ("FB") business was that of a broker, arranging freight shipments on behalf of customers by contracting with third-party independent contractors to haul the customers' freight at pre-negotiated rates. FB employees were intermediaries who participated in the brokerage of freight to serve the transportation needs of customers/shippers. FB was ranked in the top 25 brokerages for many years in the United States freight brokerage industry, in which there are over 12,000 Department of Transportation licenses to conduct brokerage. FB matched customer shipments with third-party transport service providers utilizing the FB proprietary database of over 20,000 qualified third-party carriers. The Debtors, through FB, also recruited carriers, established contracts, monitored services records, and generally maintained the relationship with the trucking companies.

FB revenues were derived from the spread (i.e., margin) between pre-established or negotiated rates with customers and the amount paid to the contracted carrier. FB was the intermediary of the monies of the shipper paid to FB and due to the contracted carriers who actually transported the goods and provided the service. The margin was derived from the difference between what was paid by the customer/shipper and what the broker negotiated with

the carrier to be paid for their services. FB's credibility was through the good stewardship of the customers/shippers and carriers funds which were transacted or managed through FB. FB employees were compensated with a base salary and a percentage commission of the margin for each load generated.

FB provided brokerage services to customers in a broad range of industries, including food distribution, fresh produce, wholesale, retail, consumer products, and manufacturing/industrial. Customer contracts typically were one-year with the ability to cancel at-will prior to such time. FB had a national presence with 16 offices in the continental United States and one in Toronto, Canada.

FB's revenues comprised approximately 15% of the Debtors' total annual revenues.

### (iv)  Distribution Logistics

The Distribution Logistics ("DL") business managed warehouses and provided value-added logistics services such as order fulfillment, inventory management, cross-docking, packing, deconsolidation, labeling, light manufacturing and assembly, load inspection, pallet refurbishment, and just-in-time fulfillment. In a few instances, DL provided short-haul transportation services in conjunction with warehouse services. DL managed over 20 leased warehouses with approximately 3.2 million square feet of warehouse space located in numerous markets, including Phoenix, Las Vegas, Dallas, San Antonio, Aspen, Salt Lake City, and the Northern and Southern California areas.

The DL business served customers in a wide range of industries, including consumer packaged goods, beverage containers and finished beverage products, and a variety of dry goods. Customer contracts typically ranged between less than a year to three years, and typically specify service standards and rates for particular services.

DL's revenues comprised approximately 6% of the Debtors' total annual revenues.

### (b)  Summary of Corporate Structure

The Debtors' history began in August 2000, when Fenway Partners acquired a majority position in Transport Industries Holdings, a family-owned business. In 2003, the company began a series of strategic acquisitions to broaden its services offerings. These acquisitions included, among others, American Trans-Freight and Total Distribution in 2004, Cargo-Master, Inc. in 2005, Southpoint Distributing and Gallop Logistics Corporation[2] in 2006, and Greatwide Dedicated Transport III, Inc. in March 2008. In January 2006, Transport Industries Holdings' name was changed to Greatwide Logistics Services, Inc. ("Greatwide"). GWLS purchased Greatwide in December 2006. Through this acquisition, affiliates of Investcorp BSC and Hicks Holdings LLC became the majority owners of GWLS. GWLS is the ultimate parent company of the other Debtors; it has 51 wholly-owned subsidiaries.

---

[2]  Gallop Logistics Corporation is incorporated in Canada and is not a Debtor herein nor did it commence any Canadian insolvency proceeding.

### (c)     Significant Prepetition Indebtedness and Obligations

The Debtors' capital structure was comprised of: (i) a $370 million secured first lien facility, which was comprised of a $70 million revolving letter of credit facility (including a letter of credit sub-facility) and a $300 million term loan; (ii) a $117 million secured second lien term loan; and (iii) a $90 million unsecured credit facility.

### (i)     First Lien Credit Facility

Pursuant to that certain First Lien Credit Agreement, dated as of December 19, 2006, Greatwide entered into a secured credit facility in the aggregate amount of $370 million (the "First Lien Credit Facility"), comprised of a term loan of $300 million (the "First Lien Term Loan") and a revolving credit facility of $70 million (the "First Lien Revolving Credit Facility"). The First Lien Revolving Credit Facility provided for revolving credit loans, swing line loans (up to $5 million) and letters of credit (up to $50 million, initially). UBS AG, Stamford Branch ("UBS") served as the administrative agent and collateral agent for the lenders (the "First Lien Lenders") under the First Lien Credit Facility. Pursuant to the First Lien Guarantee and Collateral Agreement, dated as of December 19, 2006, GWLS and the majority of its subsidiaries (collectively with GWLS, the "Guarantors") guaranteed the obligations under the First Lien Credit Facility.

The First Lien Credit Facility was secured by substantially all of the assets of Greatwide and the Guarantors, including pledges of 100% of the capital stock of Greatwide and the Guarantors (subject to limitations regarding foreign subsidiary stock) (the "Collateral").

As of September 30, 2008, the outstanding principal amount under the First Lien Term Loan was $296.25 million. As of September 30, 2008, the outstanding principal amount under the First Lien Revolving Credit Facility was $70 million inclusive of $31,498,640 in outstanding letters of credit.

In connection with the Sale, discussed below, the First Lien Lenders credit bid 90% of the amount outstanding under the First Lien Credit Facility. Upon the closing of the Sale, a $38,151,689.20 Deficiency Claim remained, which is being treated under the Plan in accordance with the 9019 Settlement.

### (ii)     Second Lien Credit Facility

Greatwide also was the borrower under that certain Second Lien Credit Agreement, dated as of December 19, 2006, (the "Second Lien Credit Facility"). Pursuant to the Second Lien Guarantee and Collateral Agreement, dated as of December 19, 2006, the Guarantors also guaranteed the obligations under the Second Lien Credit Facility. The Second Lien Credit Facility provided an aggregate term loan of $117 million. Effective as of September 9, 2008, UBS resigned as the administrative agent and collateral agent for the lenders (the "Second Lien Lenders") under the Second Lien Credit Facility.

The Second Lien Credit Facility was secured by substantially all of the assets of Greatwide and the Guarantors; such liens were second in priority to the liens securing the First Lien Credit Facility.

At the time the First Lien Facility and the Second Lien Facility were executed, the lenders also entered into that certain Intercreditor Agreement, dated as of December 19, 2006 (the "Intercreditor Agreement"). The Intercreditor Agreement governed, among other things, the respective rights and remedies of the First Lien Lenders and Second Lien Lenders with respect to the Prepetition Collateral.

### (iii)  Mezzanine Facility

GWLS entered into the Amended and Restated Senior Holdings Credit Agreement, dated as of December 19, 2006 (as amended and restated as of April 30, 2007, the "Mezzanine Facility"). The Mezzanine Facility was unsecured and not guaranteed by any of the other Debtors. As of September 30, 2008, the outstanding principal amount under the Mezzanine Facility was $90 million plus approximately $24 million in pay-in-kind interest.

### (iv)  Certain Letters of Credit

Prior to the Petition Date, UBS issued two letters of credit for the benefit of the Debtors, one in the amount of $8 million in favor of ACE American Insurance Company and the other in the amount of $500,000 in favor of one of the Debtors' surety bond providers. The Debtors cash collateralized these letters of credit, which were issued outside of the First Lien Credit Facility, with UBS.

### 4.2    Events Leading to the Chapter 11 Filing

For more than a year leading up to the commencement of these chapter 11 cases, the Debtors faced significant challenges, including, inter alia: (i) significant fuel price increases; (ii) one of the most significant industry-wide freight declines in the prior decade; (iii) revenue shortfalls in the Debtors' businesses that impacted profitability; (iv) a variety of volume and customer-related issues that impacted profitability; and (v) a significant and unexpected increase in required collateral for insurance.

As a result of these operational difficulties and the resultant liquidity constraints, the Debtors began discussions with their First and Second Lien Lenders in early June 2008 regarding the need for covenant and other relief under the First and Second Lien Credit Facilities. Subsequently, given such discussions and their desire to maximize liquidity, the Debtors determined it would not be prudent for them to make scheduled principal and interest payments of approximately $8.3 million due on June 30, 2008 under their First and Second Lien Credit Facilities. As a result thereof, on July 1, 2008, UBS provided the Debtors with default notices under such facilities. Shortly thereafter, the Debtors entered into forbearance agreements with the First and Second Lien Lenders in order to pursue an agreement on the terms of a covenant amendment package and liquidity infusion to address the issues confronting the Debtors.

In July 2008, the Debtors and certain of their equity owners made a proposal to the First and Second Lien Lenders that they believed would provide the Debtors with the liquidity and financial flexibility to operate in the current environment. After receiving and evaluating the feedback they received from certain of their lenders, the Debtors and their equity owners made a revised proposal in early August 2008, which contemplated the investment by existing equity holders of additional capital. This enhanced proposal was premised upon, among other things,

the condition that the Debtors' insurance provider not require more than $5 million in additional collateral coverage in order to renew the Debtors' workers' compensation and general and automobile liability policies that then were due to expire on September 30, 2008.

In early September, while the Debtors' First and Second Lien Lenders were considering this proposal, the Debtors were informed by Liberty Mutual Insurance Company ("Liberty"), then their primary insurance provider, that Liberty required an additional $32 million in collateral to support Liberty's continuation of the Debtors' insurance coverage beyond its September 30, 2008 expiration date. The required additional collateral was unexpected and effectively rendered the proposal that had been under consideration no longer feasible, and the Debtors were forced to give further consideration to other strategic alternatives. In order to provide themselves with additional time to consider and pursue other alternatives, without having immediately to procure the debtor in possession financing that would have been required to fund Liberty's demand for additional collateral, the Debtors investigated and ultimately were able to procure replacement insurance coverage for a period of 90-days with ACE American Insurance Company, another insurer, by posting a letter of credit in the face amount of $8 million.

At all times during the process, the Debtors stressed that they believed a global restructuring supported by both the First Lien Lenders and the Second Lien Lenders was in the best interests of the Debtors and their various stakeholders and that the Debtors' businesses would not be able to survive a prolonged chapter 11 process. In an effort to pursue a consensual restructuring, the Debtors engaged in discussions with certain significant First and Second Lien Lenders regarding potential strategic alternatives. The Debtors negotiated nondisclosure agreements with these parties and granted them access to an electronic data room. The Debtors also allowed these parties to meet with management and conduct follow up due diligence. In early October, as a result of the due diligence process, the Debtors received a non binding restructuring proposal from a portfolio company of the Debtors' largest Second Lien Lender. Unfortunately, given the inability of their lenders to agree on the terms of a consensual restructuring, the Debtors' need to reduce their debt load and interest expense, and the Debtors' increasing concerns about the potential deterioration of their businesses — and concomitant degradation in value — due to rumors in the marketplace regarding the Debtors' liquidity and viability, the Debtors determined that the value of their estates would best be maximized and preserved through a sale process. Accordingly, the Debtors negotiated a going-concern sale of their businesses and assets to their First Lien Lenders in the form of a credit bid and commenced these Chapter 11 Cases to implement that sale pursuant to section 363 of the Bankruptcy Code, subject to a competitive sale process and the solicitation of higher and/or otherwise better offers. The Debtors believed that, unless a sale was expeditiously consummated, there would have been significant value deterioration.

## ARTICLE 5
## SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE

### 5.1    Commencement of the Chapter 11 Cases

On the Petition Date, the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Chapter 11 Cases were assigned to the Honorable Peter J.

Walsh, United States Bankruptcy Judge, United States Bankruptcy Court for the District of Delaware. Since the Petition Date, the Debtors have continued to manage their property as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code. No trustee has been appointed in these cases.

## 5.2   First Day Orders

Shortly after the Petition Date, the Bankruptcy Court entered several orders authorizing the Debtors to, among other things, pay wages, salaries, employee benefit payments, independent contractor obligations, various taxes and regulatory fees, and authorizing the Debtors to maintain certain bank accounts, cash management systems and business forms.

## 5.3   DIP Financing

On November 24, 2008, this Court entered a final order (the "DIP Order") authorizing, among other things, the Debtor to enter into a senior secured, superpriority debtor-in-possession credit agreement (the "DIP Facility") in the amount of up to $73.6 million, structured as a delayed-draw term loan facility and providing for up to $60 million in letters of credit, which was provided by a syndicate of banks, financial institutions and other entities, including UBS AG, Stamford Branch, as Administrative Agent and Issuing Lender, General Electric Capital Corporation, as Collateral Agent, UBS Securities LLC and Ableco Finance LLC, as Joint Lead Arrangers, and UBS Securities LLC, as Documentation Agent, Syndication Agent and Bookrunner. The DIP Facility provided the Debtors with much needed liquidity to fund, in combination with cash generated from operations, their operating, working capital and capital expenditure needs during the course of these Chapter 11 Cases, including meeting their payroll and independent contractor obligations.

## 5.4   Appointment of Official Unsecured Creditors' Committee

On October 30, 2008, the Office of the U.S. Trustee appointed an official committee of unsecured creditors (the "Committee"). The Committee is comprised of three members: Cedarview Capital Management, Blackport Capital Fund Ltd. and Citidel Investment Group, LLC. On February 10, 2009, the Amended Appointment of the Committee was docketed by the Office of the U.S. Trustee, noting the resignation of Blackport Capital Fund Ltd. The Bankruptcy Court authorized the Committee to retain the law firms of Pepper Hamilton LLP and Otterbourg, Steindler, Houston & Rosen, P.C., as its legal co-counsel, and Traxi LLC, as its financial advisor.

## 5.5   The Sale of Substantially All of the Debtors' Assets

Prior to the filing of the Chapter 11 Cases, the Debtors determined that the value of their estates would be maximized and preserved best through an expedited and deliberative sale process. Accordingly, the Debtors negotiated a going-concern sale of their businesses and assets to Transportation 100, LLC (the "Purchaser"), subject to a competitive sale process, and agreed to the terms of an asset purchase agreement (the "Purchase Agreement"). Effectively, the Purchaser was an acquisition vehicle for the First Lien Lenders to acquire substantially all of the Debtors' assets pursuant to a credit bid equal to 90% of the total amount outstanding under the First Lien Facility. Pursuant to the Purchase Agreement, the Purchaser also agreed to satisfy the

Debtors' obligations under the DIP Facility and to assume, among other things, all ordinary course trade payables of the Debtors. To ensure maximum value for their assets, and in accordance with court-approved bidding procedures, the Debtors conducted an extensive and thorough marketing process led by Miller Buckfire & Co., LLC ("Miller Buckfire"), the Debtors' financial advisor and investment banker.

Several objections to the sale of substantially all of the Debtors' assets (the "Sale") were filed, and the Debtors were able to successfully resolve all but one, which was overruled at the Sale hearing. With respect to the Committee's objection to the Sale, the Debtors detailed the resolution on the record of the Sale hearing, which the parties agreed would be documented after the closing of the Sale. By order, dated January 23, 2009, this Court approved the Sale to the Purchaser and the Sale closed on February 20, 2009. As a result of the consummation of the Sale, the only remaining obligations owed to the First Lien Lenders are their 10% Deficiency Claim, or $38,151,689.20.

### 5.6    The Stipulation Settling the Committee's Objection to the Sale

After the closing of the Sale, the Debtors, the Committee, the First Lien Agent, and the Purchaser actively negotiated and entered into a stipulation (the "Stipulation") incorporating the settlement that had been reached by the parties resolving the Committee's objections to the Sale. Pursuant to the Stipulation:

    **(a)**    The First Lien Lenders paid $3.5 million into an account (the "Wind Down Account") to be utilized to satisfy wind down expenses of the bankruptcy estates and to fund a plan of liquidation.

    **(b)**    The First Lien Lenders agreed to carve-out $1.5 million in cash from their collateral recoveries to be "gifted" and re-distributed to eligible unsecured creditors (the "Litigation Give-Up"). Upon closing of the Sale, the Litigation Give-Up also was funded into the Wind Down Account. The Stipulation provides that, upon written instruction from the Unsecured Creditor Trustee (who is to be selected by the Committee), the Debtors are to remit the Litigation Give-Up to the trustee or escrow agent selected by the Committee, who shall distribute it to eligible unsecured creditors.

    **(c)**    The purchase price under the Purchase Agreement was adjusted as set forth in the second amendment to the Purchase Agreement attached to the Stipulation. Generally, under certain circumstances, if the new company is sold, the Purchaser will deliver to the Debtors cash in an amount equal to 2% of the amount by which the net proceeds of the sale exceed a specified threshold amount.

    **(d)**    The Deficiency Claim of the First Lien Lenders will be waived if: (i) the lenders under the Second Lien Credit Agreement did not object to the Stipulation (which they did not) or object to the Plan and the Disclosure Statement; (ii) the Stipulation is approved (which it was); and (iii) the Plan (a) provides for the substantive consolidation of the Debtors (which it does), (b) is

confirmed, and (c) becomes effective. However, if the foregoing conditions are not satisfied, then the deficiency claim will not be waived and any amounts recovered on account of such claim are to be re-distributed to all Eligible Unsecured Creditors, excluding the second lien lenders.

      **(e)**    The First Lien Lenders waived any rights to recover from the Estates on account of indemnification claims, if any, arising under the First Lien Credit Agreement.

On March 26, 2009, the Committee and the Debtors moved for entry of an order approving the Stipulation, which order was granted on May 8, 2009.

### 5.7    Rejection/Assumption of Executory Contracts and Unexpired Leases

The majority of the Debtors' executory contracts and unexpired leases (the "Contracts and Leases") were assumed and assigned to the Purchaser in connection with the Purchase Agreement, and certain of the Contracts and Leases were rejected.

Further, the Debtors determined during the course of the Chapter 11 Cases that certain Contracts and Leases to which they were parties were not immediately necessary for their ongoing businesses, and decided in their business judgment to reject such contracts and leases prior to the Sale, including, inter alia, certain vehicle leases, employment agreements and various other service contracts. In connection therewith, on December 11, 2008, December 24, 2008 and January 7, 2009, the Debtors filed their first, second and third omnibus motions for orders authorizing the rejection of certain Contracts and Leases. The Bankruptcy Court entered orders approving such motions on December 30, 2008, January 22, 2009 and January 30, 2009, respectively.

### 5.8    Procedures for Settlement and Payment of Certain Claims Covered by Insurance

Over six-hundred claims or controversies have been asserted against one or more of the Debtors allegedly arising out of certain acts or omissions in the day-to-day operation of the Debtors' businesses both before and after the Petition Date. As a result, the Debtors determined that the implementation of settlement procedures with respect to certain prepetition claims, without further Bankruptcy Court approval or relief from the automatic stay pursuant to section 362 of the Bankruptcy Code, would foster settlement discussions, alleviate the burden and expense of preparing and filing separate motions to approve the various settlements that would occur, and reduce the number of motions for relief from the automatic stay that otherwise would be filed by claimants willing to limit their recovery to proceeds from the Debtors' applicable insurance policies.

In connection therewith, the Debtors negotiated the terms of settlement procedures with their former and current primary insurers as well as the Committee. On or around December 9, 2008, the Debtors filed a motion for entry of an order authorizing and approving procedures to permit the settlement and payment of certain insured claims, which motion was approved by the Court on December 29, 2008. The majority of the Debtors' insurance policies provide for "dollar one" coverage for covered liability claims, meaning that claims determined to be covered

by the insurance policies are fully paid by the insurers, who, in the ordinary course of business, pay such insured claims and seek reimbursement of applicable deductible from the Debtors directly or by drawing (or having drawn) on letters of credit the Debtors caused to be issued in favor of the insurers.

**5.9    Authorization and Approval of Entry into the ACE Insurance Program**

Under the laws of various states in which the Debtors operated, the Debtors were required to maintain workers' compensation insurance as well as general liability and automobile liability insurance. Shortly after the Petition Date, the Debtors commenced negotiations with their primary insurer, ACE American Insurance Company (together with certain of its affiliates, "ACE"), regarding the provision of insurance coverage beyond December 31, 2008, the date the Debtors' prior workers' compensation, general liability and automobile liability coverage was to expire. As the Debtors could not operate without insurance coverage, negotiating with ACE and seeking approval of the insurance agreements was a high priority. The court approved the Debtor's new insurance program in late December 2008.

**5.10    Case Administration**

### (a)    Retention of Professionals

During the Chapter 11 Cases, the Bankruptcy Court entered orders authorizing the Debtors to retain, among others, the following professionals: (a) Willkie Farr & Gallagher LLP, as bankruptcy co-counsel, by order entered December 12, 2008; (b) Young Conaway Stargatt & Taylor, LLP as bankruptcy co-counsel, by order entered November 25, 2008; (c) Miller Buckfire & Co., LLC, as financial advisor and investment banker, by order entered December 5, 2008; (d) Conner & Winters, LLP, as special counsel, by order entered November 25, 2008; and (e) BDO Siedman, LLP as auditors, tax compliance and tax consultant professionals, by order entered November 25, 2008. The Debtors also obtained approval of their agreement with Loughlin Meghji + Company Associates, Inc, who provided James J. Loughlin, Jr. to serve as the Debtors' Vice President and Chief Restructuring Officer, Tom Hsin-Chieh Wang to serve as the Debtors' Vice President and Assistant Restructuring Officer, and additional temporary staff, by order entered November 24, 2008.

### (b)    Schedules and Establishment of Bar Dates

By Order of the Court dated November 24, 2008, the Debtors obtained an extension of time within which to file their Schedules of Assets and Liabilities, and Statements of Financial Affairs (the "Schedules and SOFAs"). The Debtors filed their Schedules and SOFAs on December 15, 2008.

Thereafter, the Bankruptcy Court set a deadline of March 30, 2009 for holders of Claims other than governmental units to submit their proofs of claim (the "General Bar Date"). The Bankruptcy Court set April 20, 2009 as the bar date for Governmental Units to submit their proofs of claim (the "Government Bar Date," and together with the General Bar Date, the "Bar Dates"). Pursuant to Bankruptcy Rule 3003(c)(2), any creditor whose Claim was not scheduled or was scheduled as disputed, contingent, or unliquidated, and who failed to file a proof of Claim on or before the applicable Bar Date, is not entitled to be treated as a creditor with respect to that

Claim for purposes of voting on the Plan or receiving a Distribution under the Plan. The Bar Dates do not apply to Administrative Expense Claims.

### (c)     Exclusivity

By Orders of the Court dated March 17, 2009, June 29, 2009 and August __, 2009, the Court extended the periods during which only the Debtors may file a plan of reorganization (the "Exclusive Proposal Period") and solicit acceptances of a plan of reorganization (the "Exclusive Solicitation Period," together with the Exclusive Proposal Period, the "Exclusive Periods") through and including August 19, 2009 and October 22, respectively.

Prior to the expiration of the Exclusive Proposal Period, the Debtors filed the Plan. The Debtors have the exclusive right to obtain acceptances relating to the Plan through and including October 22, 2009.

### 5.11    Claims

As of July 31, 2009, approximately 1,270 Claims aggregating in excess of $19 billion plus unliquidated amounts have been asserted against the Debtors. The Debtors dispute the vast majority of the dollar amount of the Claims asserted against them. See Article 2 above for estimated recoveries to holders of Allowed Claims.

## ARTICLE 6
## TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

### 6.1    Treatment of Unclassified Claims Under the Plan

#### (a)     Administrative Expense Claims

##### (i)     Payment of Administrative Expense Claims

Except: (i) to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees to a less favorable treatment; or (ii) as provided in Section 2.03 of the Plan with respect to Fee Claims, each holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; provided, however, that: (a) Administrative Expense Claims that are Assumed Liabilities have been Assumed and shall be satisfied in accordance with the Purchase Agreement and shall not be an Obligation of the Debtors or Reorganized Debtor; and (b) except to the extent provided in the preceding clause (a), Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors or liabilities arising under loans or advances to or other obligations incurred by the Debtors shall be paid in full and performed by the Reorganized Debtor in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

##### (ii)    Time for Filing Administrative Expense Claims

The holder of an Administrative Expense Claim, other than: (i) a Fee Claim; (ii) a liability incurred but not yet due and payable in the ordinary course of business by a Debtor until after the fortieth (40th) day after service of notice of the occurrence of the Effective Date; (iii) an Administrative Expense Claim that has been Allowed on or before the Effective Date; (iv) an expense or liability incurred in the ordinary course of the Debtors' businesses on or after the Effective Date; or (v) fees of the United States Trustee arising under 28 U.S.C. § 1930, must file with the Bankruptcy Court and serve on the Debtors and the Office of the United States Trustee, notice of such Administrative Expense Claim so as to be received by 5:00 p.m. prevailing Eastern time on the date that is forty (40) days after service of notice of occurrence of the Effective Date. Such notice must include at a minimum: (i) the name of the Debtor(s) that are purported to be liable for the Administrative Expense Claim; (ii) the name of the holder of the Administrative Expense Claim; (iii) the amount of the Administrative Expense Claim; (iv) the basis of the Administrative Expense Claim; and (v) supporting documentation for the Administrative Expense Claim. **Failure to file and serve such notice timely and properly shall result in the Administrative Expense Claim being forever barred and discharged.**

### (b)     Fee Claims

All entities asserting Fee Claims shall: (i) file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by no later than the date that is forty-five (45) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court; and (ii) if granted such an award by the Bankruptcy Court, be paid in full such amount as are awarded by the Bankruptcy Court (A) no later than five (5) Business Days after the date an order is entered with respect to such award or (B) upon such other terms as may be mutually agreed upon between such holder of a Fee Claim and the Reorganized Debtor. The Reorganized Debtor shall reserve and segregate Cash in an amount equal to accrued but unpaid Fee Claims as of the Effective Date, which Cash shall be used, until all Allowed Fee Claims have been paid in full, solely for the payment of Allowed Fee Claims. Objections to Fee Claims, if any, must be filed and served pursuant to the procedures set forth in the Confirmation Order no later than seventy-five (75) days after the Effective Date.

### (c)     Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, Cash in an amount equal to such Allowed Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable.

### 6.2    Class 1 - Other Priority Claims

### (a)     Impairment and Voting

Class 1 is unimpaired by the Plan. Each holder of an Allowed Other Priority Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

### (b) Treatment

Except to the extent that a holder of an Allowed Other Priority Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to such Allowed Other Priority Claim on the later of the Effective Date and the date such Allowed Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as is practicable.

### 6.3 Class 2 - Secured Tax Claims

#### (a) Impairment and Voting

Class 2 is unimpaired by the Plan. Each holder of an Allowed Secured Tax Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

#### (b) Treatment

Except to the extent that a holder of an Allowed Secured Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Secured Tax Claim shall receive Cash in an amount equal to such Allowed Secured Tax Claim on the later of the Effective Date and the date such Secured Tax Claim becomes an Allowed Secured Tax Claim, or as soon thereafter as is practicable.

### 6.4 Class 3 - Other Secured Claims

#### (a) Impairment and Voting.

Class 3 is unimpaired by the Plan. Each holder of an Other Secured Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively deemed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

#### (b) Treatment.

Except to the extent that a holder of an Allowed Other Secured Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Other Secured Claim shall receive: (i) Cash in an amount equal to such Allowed Other Secured Claim on the later of the Effective Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable; or (ii) such other treatment that leaves such Allowed Other Secured Claim unimpaired pursuant to section 1124(2) of the Bankruptcy Code.

#### (c) Deficiency Claims

To the extent that the value of the Collateral securing the Claim of a party holding an Other Secured Claim is less than the amount of such Claim, the undersecured portion of such Claim will be treated for all purposes under the Plan as an Allowed General Unsecured Claim and will be classified as a General Unsecured Claim.

### (d)      Separate Classification of Secured Claims

Although Other Secured Claims against the Debtors have been placed in one category for purposes of nomenclature, each such Other Secured Claim, to the extent secured by different liens or security interests than other Other Secured Claims, shall be treated as if in a separate class from such other Other Secured Claims for purposes of voting on the Plan and receiving distributions under the Plan (to be designated as Other Secured Claims Class 3(A), Other Secured Claims Class 3(B), Other Secured Claims Class 3(C), etc., or similar convention).

### 6.5      Class 4 - First Lien Credit Agreement Claims

#### (a)      Impairment and Voting

Class 4 is impaired by the Plan. Each holder of a First Lien Credit Agreement Claim is entitled to vote to accept or reject the Plan.

#### (b)      Allowance

First Lien Credit Agreement Claims shall be Allowed in the aggregate amount of $38,151,689.20, which is an amount equal to the Deficiency Claim.

#### (c)      Treatment

Subject to Section 4.04(d) of the Plan described below, pursuant to the 9019 Settlement, the holders of Allowed First Lien Credit Agreement Claims shall not recover any distributions on account of such claims.

#### (d)      Waiver and Re-distribution

Section 4.04(d) of the Plan provides that, notwithstanding the provisions of Section 4.04(c) of the Plan, pursuant to the 9019 Settlement: (a) if none of the Second Lien Lenders object to the Plan or the Disclosure Statement, and the Confirmation Date and the Effective Date occurs, the Deficiency Claim shall be waived for all purposes in the Chapter 11 Cases; and (b) if any of the Second Lien Lenders object to the Plan or the Disclosure Statement, the Deficiency Claim shall not be waived and any amounts recovered on account of the Deficiency Claim shall be added to the Unsecured Give-up Fund for the benefit of Eligible Unsecured Creditors and paid directly by the Debtors to the Unsecured Creditor Trustee; provided, however, in such event, the Second Lien Lenders shall not be entitled to participate in the Unsecured Give-up Fund.

### 6.6      Class 5 - General Unsecured Claims

#### (a)      Impairment and Voting

Class 7 is impaired by the Plan. Each holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

### (b)     Treatment

Each holder of an Allowed General Unsecured Claim as of the Distribution Record Date shall be entitled to receive, subject to the terms of the Plan and in full satisfaction, settlement, release and discharge of, and in exchange for such Allowed General Unsecured Claim, its Pro Rata share of the Class 5 Distribution. The Class 5 Distribution is comprised of the aggregate amount of Cash or other funds of the Debtors (including, without limitation, the amount remaining in the Wind Down Account after the satisfaction of wind-down expenses) available for payment of the Allowed Claims of General Unsecured Creditors, after the payment in full of Allowed Administrative Expense Claims, Allowed Fee Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Secured Tax Claims, and Allowed Other Secured Claims.

### 6.7     Class 6 - Insurance Claims

#### (a)     Impairment and Voting.

Class 6 is impaired by the Plan. Each holder of an Insurance Claim is entitled to vote to accept or reject the Plan.

#### (b)     Treatment.

Each holder of an Allowed Insurance Claim shall be entitled to receive, subject to the terms of the Plan and in full satisfaction, settlement, release and discharge of, and in exchange for such Allowed Insurance Claim, Cash, solely from the proceeds of the insurance policies issued to the Debtors, at such time as the Insurance Claim becomes an Allowed Insurance Claim. In no event shall the holder of a Insurance Claim be entitled to recover on such Claim from any assets of the Debtors or the Reorganized Debtor other than from the insurance policies issued to the Debtors, and shall not otherwise have any recourse against the Debtors, Reorganized Debtor or any current or former employee of the Debtors. Holders of Insurance Claims that did not timely file proofs of Claim or have their Insurance Claims deemed to be timely and Allowed Insurance Claims by Final Order of the Bankruptcy Court shall not be entitled to any recovery under the Plan or from any of the Debtors' insurers.

### 6.8     Class 7 - Equity Interests in GWLS

#### (a)     Impairment and Voting

Class 7 is impaired by the Plan. Each holder of an Equity Interest in GWLS is deemed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

#### (b)     Distributions

The holders of Equity Interests in GWLS shall not receive any distributions on account of such interests. On the Effective Date, all Equity Interests in GWLS shall be cancelled.

## ARTICLE 7
## IMPLEMENTATION OF THE PLAN

### 7.1    Substantive Consolidation

#### (a)    Effect and Analysis of Substantive Consolidation

Substantive consolidation is an equitable remedy which a bankruptcy court may be asked to apply in cases involving affiliated debtors. As contrasted with procedural consolidation,[3] substantive consolidation may affect the substantive rights and obligations of creditors and debtors. Substantive consolidation involves the pooling and merging of the assets and liabilities of the affected debtors; all of the debtors in the substantively consolidated group are treated as if they were a single corporate/economic entity. The consolidated assets create a single fund from which all claims against the consolidated debtors are to be satisfied. Consequently, a creditor of one of the substantively consolidated debtors is treated as a creditor of the substantively consolidated group of debtors and issues of individual corporate ownership of property and individual corporate liability on obligations are ignored.

The power to substantively consolidate interrelated chapter 11 cases lies in a bankruptcy court's general equitable powers which are set forth in section 105 of the Bankruptcy Code. Within this framework, the factors to which courts have looked to determine the appropriateness of substantive consolidation include: (a) whether creditors dealt with the debtor entities as a single economic unit and did not rely on their separate identities in extending credit; and (b) whether the affairs of the debtors are so entangled that the consolidation will benefit all creditors of the debtors' estates. Additional factors include: (i) the presence or absence of consolidated financial statements; (ii) the existence of inter-company guarantees or loans; (iii) the unity of interest and ownership between the various corporate entities; (iv) the transfer of assets without observance of corporate formalities; (v) the degree of difficulty in segregating and ascertaining individual assets and liabilities; (vi) the parent, its affiliates and subsidiaries having common directors and/or officers; (vii) the parent or its affiliates financing one another; and (viii) the commingling of assets and business functions.

#### (b)    Substantive Consolidation Under the Plan

The Debtors and Committee believe that substantive consolidation of the Debtors' Estates will facilitate implementation of the Plan and foster similarity and fairness of treatment of holders of Claims. The Debtors and Committee believe that these factors have been satisfied sufficiently to warrant an order of substantive consolidation in these Chapter 11 Cases. In addition, no prejudice is likely to result from the substantive consolidation of these. Hence, the

---

[3] Procedural consolidation is the administrative process (contemplated by Bankruptcy Rule 1015(b)) whereby the proceedings of two or more affiliated debtors are conducted as part of a single proceeding for the convenience of the bankruptcy court and parties in interest. Procedural consolidation does not affect the substantive rights of the debtors or their respective creditors and interest holders. The Debtors' cases were procedurally consolidated by order of the Court dated October 22, 2008.

Debtors and Committee believe that substantive consolidation is not only justified pursuant to applicable law, but is also in the best interests of their creditors.

The Plan contemplates and is predicated upon entry of the Confirmation Order affecting the substantive consolidation of the Debtors for all purposes, including voting, confirmation, and distribution. On and after the Effective Date: (i) all assets and liabilities of the Debtors shall be treated as though they were pooled; (ii) no distributions shall be made under the Plan on account of any Claim held by a Debtor against any other Debtor; (iii) no distributions shall be made under the Plan on account of any Equity Interest held by a Debtor in any other Debtor; and (iv) all guarantees of any Debtors of the obligations of any other Debtor shall be eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor, and any joint or several liability of any of the Debtors shall be one obligation of the substantively consolidated Debtors.

Further, pursuant to the Stipulation, discussed in Section 5.6 above, if the Debtors are not substantively consolidated, then the First Lien Lenders' deficiency claim will not be waived and any amount recovered thereunder shall be re-distributed to all eligible holders of general unsecured claims, excluding the second lien lenders.

The substantive consolidation effected pursuant to Section 5.01(a) of the Plan shall not affect, without limitation: (i) defenses to any Cause of Action or requirements for any third party to establish mutuality in order to assert a right of setoff; or (ii) distributions out of any insurance policies or proceeds of such policies.

This Disclosure Statement and the Plan shall be deemed to be a motion requesting that the Bankruptcy Court approve the substantive consolidation provided for in the Plan. UNLESS AN OBJECTION TO CONSOLIDATION IS MADE IN WRITING BY ANY CREDITOR AFFECTED BY THE PLAN ON OR BEFORE 4:00 P.M. EASTERN TIME, ON THE DATE THAT IS TEN (10) DAYS BEFORE THE CONFIRMATION HEARING, OR SUCH OTHER DATE AS MAY BE FIXED BY THE BANKRUPTCY COURT, THE CONSOLIDATION PROPOSED BY THE PLAN MAY BE APPROVED BY THE BANKRUPTCY COURT AT THE CONFIRMATION HEARING. In the event any such objections are timely filed, a hearing with respect thereto shall be scheduled by the Bankruptcy Court, which hearing may, but need not, coincide with the Confirmation Hearing.

In the event the Bankruptcy Court determines that substantive consolidation of the Debtors is not appropriate, the Debtors and Committee may request that the Bankruptcy Court otherwise confirm the Plan and the treatment of and distribution to the different Classes under the Plan on a Debtor-by-Debtor basis.

## 7.2    **Continued Corporate Existence**

Following the Effective Date, the Debtors shall be deemed substantively consolidated into one Reorganized Debtor, with all the powers available to such entity under applicable law in the jurisdiction in which the Reorganized Debtor is organized or otherwise formed and pursuant to its certificate of incorporation and by-laws or other organizational documents without prejudice to any right to terminate such existence under applicable law after the Effective Date.

### 7.3    Assumed Liabilities

From and after the Effective Date, none of the Assumed Liabilities shall any longer be obligations of the Debtors, their Estates or the Reorganized Debtor, and the holder of any Claim with respect thereto shall have no recourse on account of such Claim, against the Debtors, the Reorganized Debtor or their property.

### 7.4    Cancellation of Existing Securities and Agreements

On the Effective Date, any document, agreement, or instrument evidencing any Claim or Equity Interest (including, but not limited to, the First Lien Credit Agreement, the Second Lien Credit Agreement, and the Mezzanine Facility) shall be deemed cancelled without further act or action under any applicable agreement, law, regulation, order, or rule and the obligations of the Debtors under such documents, agreements, or instruments evidencing such Claims and Equity Interests, as the case may be, shall be discharged.

### 7.5    Post-Confirmation Oversight Committee

The Post-Confirmation Oversight Committee shall be comprised of up to three (3) members selected by the Committee on or prior to the Effective Date.  The members of the Post-Confirmation Oversight Committee shall not be compensated for service on such Committee but shall be entitled to reimbursement of reasonable out-of-pocket expenses.  Except as noted below, the role of the Post-Confirmation Oversight Committee shall be limited to consulting with the Plan Administrator on the following matters: (a) the timing and amount of interim distributions; (b) compliance with the Plan and the obligations hereunder; (c) the employment, retention, or replacement of professionals to represent the Post-Confirmation Oversight Committee or the Plan Administrator with respect to their responsibilities; (d) the objection to Claims as provided in this Plan, and prosecution of such objections; (e) the compromise and settlement of any issue or dispute regarding the amount, validity, priority, treatment, or allowance of any Claim; (f) the establishment, replenishment or release of reserves as provided in the Plan, as applicable; (g) the exercise of such other powers as may be vested in the Plan Administrator pursuant to the Plan, the Plan Administrator Agreement or any other Plan Documents or order of the Bankruptcy Court; (h) taking all actions necessary or appropriate to enforce the Debtors' rights under the Sale Transaction Documents; (i) making all determinations on behalf of the Debtors under the Purchase Agreement; (j) filing applicable tax returns for any of the Debtors or the Reorganized Debtor; and (k) liquidating any of the Excluded Assets.  Any member of the Post-Confirmation Oversight Committee may be removed by the Bankruptcy Court for cause shown, after notice and a hearing.  The Post-Confirmation Oversight Committee may retain legal counsel and financial advisors to advise it in the performance of its duties.  In the event there are no members of the Post-Confirmation Oversight Committee, whether by *death, resignation or removal*, the Plan Administrator shall be free to act in its sole discretion subject to the requirements of the Plan and the Confirmation Order.  The duties of the Post-Confirmation Oversight Committee shall also include services related to any applications for allowance of compensation or reimbursement of expenses of professionals persons pending on the Effective Date or filed after the Effective Date (collectively, the "Filed Fee Applications") and the Post-Confirmation Oversight Committee shall have the right to be heard on all issues relating to final applications for allowances of compensation for services rendered and reimbursement of expenses incurred

through the Effective Date. The Reorganized Debtor shall pay: (a) the reasonable expenses of the members of the Committee between the Confirmation Date and the Effective Date, and the reasonable expenses of the members of the Post-Confirmation Oversight Committee on and after the Effective Date (the "Post-Confirmation Date Committee Expenses"); and (b) on and after the Effective Date, the reasonable fees and expenses of the professional persons employed by the Post-Confirmation Oversight Committee in connection with its duties and responsibilities as set forth in the Plan (the "Post-Confirmation Oversight Committee Professional Fees"). The Post-Confirmation Date Committee Expenses and the Post-Confirmation Oversight Committee Professional Fees shall be paid within ten (10) Business Days after submission of a detailed invoice therefor to the Reorganized Debtor. If the Reorganized Debtor disputes the reasonableness of any such invoice, the Reorganized Debtor, the Post-Confirmation Oversight Committee or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved. The undisputed portion of such reasonable fees and expenses shall be paid as provided in the Plan. The Post-Confirmation Oversight Committee shall be dissolved and the members thereof shall be released and discharged of and from further authority, duties, responsibilities and obligations relating to and arising from and in connection with the Chapter 11 Cases on the later of: (a) the Final Distribution Date; and (b) the date all services related to the Filed Fee Applications are completed, and the retention or employment of the Post-Confirmation Oversight Committee's professionals shall terminate. Service as a member of the Post-Confirmation Oversight Committee shall not preclude service on any trust advisory board or committee to be established, if any, with respect to the Unsecured Creditor Trust.

### 7.6 Conditions to Confirmation and Consummation

#### (a) Conditions to Confirmation

Pursuant to Section 12.01 of the Plan, the Plan may not be confirmed unless: (a) the Bankruptcy Court shall have approved this Disclosure Statement with respect to the Plan in an order in form and substance reasonably acceptable to the Debtors and the Committee; (b) the Confirmation Order shall be in form and substance reasonably acceptable to the Debtors and the Committee; and (c) in each case subject to the occurrence of the Effective Date, to the extent necessary or appropriate, the Plan Documents to be entered into (rather than assumed) by the Reorganized Debtor shall have been entered and delivered, all actions, documents, and agreements necessary to implement the Plan shall have been effected or executed and the Debtors shall have received all material authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are reasonably necessary to implement the Plan and that are required by law, regulation, or order.

#### (b) Effectiveness

The Plan shall not become effective unless and until: (i) the Confirmation Order shall have become final and non-appealable; and (ii) the Plan Documents shall have been executed and become effective.

### (c)    Waiver of Conditions

The Proponents, in their sole discretion and to the extent not prohibited by applicable law, may waive one or more of the conditions precedent: (i) to effectiveness of the Plan set forth in section 12.02 of the Plan in whole or part, upon five Business Days' notice to the Bankruptcy Court without a hearing; or (ii) to confirmation of the Plan set forth in Section 12.01 of the Plan prior to the Confirmation Date without any hearing. The failure to satisfy or waive any condition to the Confirmation Date or the Effective Date may be asserted by the Proponents in their sole discretion regardless of the circumstances giving rise to the failure of such conditions to be satisfied (including any action or inaction by the Debtors in their sole discretion). The failure of the Proponents in their sole discretion to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

### (d)    Withdrawal of Plan

The Debtors and the Committee reserve the right to mutually revoke or withdraw the Plan at any time prior to the Effective Date.

If the Debtors and the Committee mutually revoke or withdraw the Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), the assumption or rejection of executory contracts, unexpired leases, any release, exculpation or indemnification provided for in the Plan, and any document or agreement executed pursuant to the Plan shall be null and void. In such event, nothing contained therein, and no acts taken in preparation for consummation of the Plan shall be deemed to constitute a waiver or release of any Claims by or against or Equity Interest in the Debtors or any other Person, to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or to constitute an admission of any sort by the Debtors or any other Person.

## ARTICLE 8
## DISBURSEMENTS UNDER THE PLAN

### 8.1    Disbursements Under the Plan

### (a)    Disbursing Agent; Cash

Except as otherwise provided in the Plan or the Confirmation Order, all distributions under the Plan shall be made by the Disbursing Agent. Any payment of Cash made by the Disbursing Agent pursuant to the Plan shall, at the Disbursing Agent's option, be made by check drawn on a domestic bank or wire transfer.

### (b)    Timing of Distributions

In the event that any payment, distribution, or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution or the performance of such act may be completed on or as soon as reasonably practicable after

the next succeeding Business Day, but shall be deemed to have been completed as of the required date. Any requirement under the Plan that the Reorganized Debtor or Disbursing Agent make a payment or distribution on a date shall mean that such party is required to commence the process of making a payment or distribution on such date.

### (c)     Holders as of the Distribution Record Date

As of the close of business on the Distribution Record Date: (i) the claims register maintained in the Chapter 11 Cases shall be closed; and (ii) any transfer of any Claim (including any First Lien Credit Agreement Claim, Second Lien Credit Agreement Claim, or Mezzanine Facility Claim) or any interest therein shall be prohibited. Neither the Debtors nor the Reorganized Debtor shall have any obligation to recognize any transfer of any Claim occurring after 5:00 p.m. (New York time) on the Distribution Record Date, and shall instead be entitled to recognize and deal for all purposes under the Plan with only those holders of record as of 5:00 p.m. (New York time) on the Distribution Record Date.

### (d)     Distributions to Address of Record

Subject to Bankruptcy Rule 9010, and except as set forth in Section 6.07 of the Plan, all distributions under the Plan to holders of Allowed Claims shall be made to the holder of each Allowed Claim at the address of such holder as listed on the Schedules as of the Distribution Record Date, unless the Debtors or, on and after the Effective Date, the Reorganized Debtor, have been notified in writing of a change of address, including, without limitation, by the timely filing of a proof of claim by such holder that provides an address for such holder different from the address reflected on the Schedules. In the event that any distribution to any such holder is returned as undeliverable, no distribution to such holder shall be made unless and until the appropriate Disbursing Agent has been notified of the then current address of such holder, at which time or as soon as reasonably practicable thereafter, such distribution shall be made to such holder without interest; provided, however, that, at the later of the expiration of one (1) year from the Effective Date and the date a Claim becomes an Allowed Claim, such distributions shall be deemed unclaimed property and shall revest in the Reorganized Debtor and be distributed to other holders of Allowed Claims, in accordance with the Plan or otherwise ordered by the Bankruptcy Court, as set forth in Section 6.09 of the Plan.

### (e)     Minimum Distributions

No payment of Cash of less than ten dollars ($10) shall be made by the Reorganized Debtor to any holder of an Allowed Claim unless a request therefor is made in writing to the Reorganized Debtor. If no request is made as provided in the preceding sentence within ninety (90) days of the later of the Effective Date or the date such Claim is Allowed, all such distributions shall be distributed to other holders of Allowed Claims in accordance with the Plan or as otherwise ordered by the Bankruptcy Court.

### (f)     Unclaimed Distributions

All distributions to holders of Allowed Claims under the Plan that are unclaimed for a period of one (1) year after distribution thereof shall be deemed unclaimed property under Bankruptcy Code section 347(b), and any entitlement of any holder of any Claim to such

distributions shall be extinguished and forever barred. All such unclaimed property shall revest in the Reorganized Debtor and be distributed to other holders of Allowed Claims in accordance with the Plan or otherwise ordered by the Bankruptcy Court.

### (g)     Setoffs

The Debtors and Reorganized Debtor may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made), any Causes of Action of any nature whatsoever that the Debtor or Reorganized Debtor may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Reorganized Debtor of any such Causes of Action that the Debtors or Reorganized Debtor may have against the holder of such Claim.

### (h)     Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

### (i)     Estimation of Claims

For purposes of calculating and making distributions under the Plan, the Debtors and the Reorganized Debtor shall be entitled to estimate, in good faith and with due regard to litigation risks associated with Disputed Claims, the maximum dollar amount of Allowed and Disputed Claims, inclusive of contingent and/or unliquidated Claims in a particular Class. The Debtors and the Reorganized Debtor also shall be entitled to seek one or more estimation orders from the Bankruptcy Court for such purposes, which requests may be joined with objections to the Claims that are subject to any such request. Appropriate Disputed Claims reserves shall be established for each category of Claims as to which estimates are utilized or sought. Notwithstanding the foregoing: (i) neither the Debtors nor Reorganized Debtor shall be obligated to physically segregate and maintain separate accounts for reserves; and (ii) unless otherwise ordered by the Bankruptcy Court, no reserves shall be required to be established or maintained with respect to Claims or Administrative Expense Claims filed after the applicable Bar Date. Reserves may be merely bookkeeping entries or accounting methodologies, which may be revised from time to time, as appropriate.

### (j)     No Recourse

Notwithstanding that the Allowed amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules or is Allowed in an amount for which after application of the payment priorities established by the Plan there is insufficient value to provide a recovery equal to that received by other holders of Allowed Claims in the respective Class, no Claim holder shall have recourse against the Disbursing Agent, the Debtors, the Reorganized Debtor, the Plan Administrator, or any of their

respective professionals, consultants, officers, directors, employees or members or their successors or assigns, or any of their respective property. However, nothing in the Plan shall modify any right of a holder of a Claim under section 502(j) of the Bankruptcy Code, nor shall it modify or limit the ability of claimants (if any) to seek disgorgement to remedy any unequal distribution from parties other than those released under this section. THE ESTIMATION OF CLAIMS AND THE ESTABLISHMENT OF RESERVES UNDER THE PLAN MAY LIMIT THE DISTRIBUTION TO BE MADE ON INDIVIDUAL DISPUTED CLAIMS, REGARDLESS OF THE AMOUNT FINALLY ALLOWED ON ACCOUNT OF SUCH DISPUTED CLAIMS.

### (k) Intercompany Claims

Intercompany Claims shall be deemed resolved and eliminated as a result of the terms embodied in the Plan (including the relevant distributions being made to the holders of Claims in the Classes under the Plan and the substantive consolidation of the Debtors). Holders of Intercompany Claims shall not be entitled to vote on the Plan or receive any distribution under the Plan on account thereof.

### (l) Satisfaction of Claims and Equity Interests

Unless otherwise provided in the Plan or the Confirmation Order, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete settlement, satisfaction and discharge of such Allowed Claims.

## ARTICLE 9
## EFFECT OF CONFIRMATION

### 9.1 Binding Effect

From and after the Confirmation Date, but subject to the occurrence of the Effective Date, the Plan shall be binding and inure to the benefit of the Debtors, all present and former holders of Claims and Equity Interests, and their respective assigns, including the Reorganized Debtor.

### 9.2 Vesting of Assets

Upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Excluded Assets shall revest in the applicable Reorganized Debtor, in each case free and clear of all Claims, Liens, encumbrances, charges, and other interests, except: (i) as otherwise provided in the Plan or in the Confirmation Order; and (ii) the Debtors may provide in the Confirmation Order that such vesting and revesting shall, without any action by any party, be deemed to vest in trust for the benefit of those entitled to distributions pursuant to the Plan. From and after the Effective Date, the Reorganized Debtor shall continue to operate to implement the Plan and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as provided therein. Without limiting the foregoing, pursuant to section 1123(b)(3) of the Bankruptcy Code, except for (x) any Causes of Action expressly waived by the Debtors pursuant to the terms of the Plan and (y) any Causes of Action

included in the Purchased Assets, the Reorganized Debtor shall retain and shall have the exclusive right, in its discretion to enforce against any Person any and all Causes of Action of the Debtors.

### 9.3 Discharge of the Debtors and of Claims and Termination of Equity Interests

Upon the Effective Date and in consideration of the rights afforded in the Plan and the payments and distributions to be made in accordance with the Plan, except as otherwise provided therein or in the Confirmation Order, each holder (as well as any trustees and agents on behalf of each holder) of a Claim against or Equity Interest in a Debtor and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors of and from any and all Liens, Claims, Equity Interests, encumbrances, liabilities and rights that arose prior to the Effective Date of any kind, nature, or description whatsoever, including any accrued interest, against or in any of the Debtors (collectively, the "Discharged Obligations"). Except as otherwise provided in the Plan, upon the Effective Date, all such holders of Liens, Claims, liabilities, encumbrances and Equity Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, 1141 of the Bankruptcy Code, from prosecuting or asserting any Discharged Obligation against any of the Debtors or Reorganized Debtor, or any of their respective affiliates, or against any of their assets or properties, whether or not such holder has filed a proof of Claim or proof of Equity Interest.

### 9.4 Term of Pre-Confirmation Injunctions or Stays

Unless otherwise provided in the Plan, the Confirmation Order, or a separate order from the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date: (i) shall remain in full force and effect until the later of the Effective Date and the date indicated in such applicable order; and (ii) with respect to all proceeds of the Sale Transactions and Excluded Assets, shall remain in effect until, and for purposes of enjoining any action interfering with, the final distribution of such proceeds pursuant to the terms of the Plan.

### 9.5 Injunction Against Interference with Plan

Upon the entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former affiliates, employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

### 9.6 Injunction

Except as otherwise expressly provided in the Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Liens, Claims, Liabilities or encumbrances against or Equity Interests in, any or all of the Debtors, along with their respective present or former employees, agents, officers, directors, or principals, are permanently enjoined, with respect to any such Liens, Claims, liabilities or encumbrances or Equity Interests, as of the Confirmation Date but subject to the occurrence of the Effective Date, from: (a) commencing, conducting or continuing in any

manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Reorganized Debtor, or any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons or any property of any such transferee or successor; (b) enforcing, levying, attaching (including any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtors, the Reorganized Debtor, or the Purchased Assets or any of their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property of any such transferee or successor; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Reorganized Debtor, or any of their property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons; (d) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; (e) taking any actions to interfere with the implementation or consummation of the Plan or the Sale Transactions; and (f) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan, such as commencing or continuing in any manner any action or other proceeding of any kind with respect to any Claims and Causes of Action which are extinguished or released pursuant to the Plan; provided, however, that nothing contained in Section 11.06 of the Plan shall preclude such Persons from exercising their rights arising under and consistent with the terms of the Plan.

### 9.7 Releases

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR CONFIRMATION ORDER, AS OF THE EFFECTIVE DATE, THE DEBTORS AND REORGANIZED DEBTOR, IN THEIR INDIVIDUAL CAPACITIES AND AS DEBTORS IN POSSESSION, SHALL BE DEEMED TO FOREVER RELEASE AND WAIVE ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION AND LIABILITIES (OTHER THAN THE RIGHTS OF THE DEBTORS OR THE REORGANIZED DEBTOR TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, INDENTURES AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED THEREUNDER OR THE SALE TRANSACTION DOCUMENTS) WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, WHICH ARE BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR AFTER THE PETITION DATE (OR THE DATE OF APPOINTMENT, ENGAGEMENT OR QUALIFICATION) AND TO AND INCLUDING THE EFFECTIVE DATE IN ANY WAY RELATING TO THE DEBTORS, THE REORGANIZED DEBTOR, THE CHAPTER 11 CASES, THE PLAN OR THE DISCLOSURE STATEMENT, AND THAT COULD HAVE BEEN ASSERTED BY OR ON BEHALF OF THE DEBTORS, OR THE REORGANIZED DEBTOR, WHETHER DIRECTLY, INDIRECTLY, DERIVATIVELY OR IN ANY REPRESENTATIVE OR ANY OTHER CAPACITY, AGAINST THE FOLLOWING PERSONS IN THEIR

RESPECTIVE CAPACITIES AS SUCH (THE "RELEASED PARTIES"): (I) THE CURRENT OFFICERS AND EMPLOYEES OF THE DEBTORS, EXCEPT FOR ANY CLAIM FOR MONEY BORROWED FROM OR OWED TO THE DEBTORS OR ITS SUBSIDIARIES BY ANY SUCH DIRECTORS, OFFICERS OR EMPLOYEES OR; (II) ANY CURRENT AND FORMER DIRECTORS AND OFFICERS OF THE DEBTORS, IN EACH CASE WHO WERE FIRST APPOINTED AFTER THE PETITION DATE; (III) THE DEBTORS' PROFESSIONALS, AND THEIR RESPECTIVE AFFILIATES AND CURRENT AND FORMER OFFICERS, PARTNERS, DIRECTORS, EMPLOYEES, AGENTS, MEMBERS, SHAREHOLDERS, ADVISORS (INCLUDING ANY ATTORNEYS, FINANCIAL ADVISORS, INVESTMENT BANKERS AND OTHER PROFESSIONALS RETAINED BY SUCH PERSONS); (IV) THE DIP AGENT AND THE DIP LENDERS, AND PROFESSIONALS OF THE FOREGOING; AND (V) THE COMMITTEE AND ITS CURRENT OR FORMER MEMBERS, AND THEIR RESPECTIVE AFFILIATES AND CURRENT AND FORMER OFFICERS, PARTNERS, DIRECTORS, EMPLOYEES, AGENTS, SHAREHOLDERS, ADVISORS (INCLUDING ANY ATTORNEYS, FINANCIAL ADVISORS, AND OTHER PROFESSIONALS RETAINED BY SUCH PERSONS) LIMIT TO CAPACITY AS COMMITTEE MEMBERS; PROVIDED, HOWEVER, THAT IN NO EVENT SHALL ANYTHING IN SECTION 11.07 OF THE PLAN BE CONSTRUED AS A RELEASE OF ANY PERSON'S FRAUD OR WILLFUL MISCONDUCT.

RELEASES BY HOLDERS OF CLAIMS AND EQUITY INTERESTS. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ON THE EFFECTIVE DATE, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, AS SUCH LAW MAY BE EXTENDED OR INTERPRETED SUBSEQUENT TO THE EFFECTIVE DATE, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS, IN CONSIDERATION FOR THE OBLIGATIONS OF THE DEBTORS AND THE REORGANIZED DEBTOR UNDER THE PLAN, THE SALE TRANSACTION DOCUMENTS, AND OTHER CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS OR DOCUMENTS EXECUTED AND DELIVERED IN CONNECTION WITH THE PLAN AND THE SALE TRANSACTION DOCUMENTS, AND EACH ENTITY (OTHER THAN THE DEBTORS) THAT HAS HELD, HOLDS OR MAY HOLD A CLAIM OR EQUITY INTEREST, AS APPLICABLE, WILL BE DEEMED TO HAVE CONSENTED TO THE PLAN FOR ALL PURPOSES AND THE RESTRUCTURING EMBODIED THEREIN AND WILL BE DEEMED TO FOREVER RELEASE, WAIVE AND DISCHARGE ALL CLAIMS, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION OR LIABILITIES (OTHER THAN THE RIGHT TO ENFORCE THE OBLIGATIONS OF ANY PARTY UNDER THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS AND DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN), INCLUDING AS A RESULT OF THE PLAN BEING CONSUMMATED, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT OR OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR AFTER THE PETITION DATE THROUGH AND INCLUDING THE EFFECTIVE DATE IN ANY WAY RELATING TO

THE DEBTORS, THE CHAPTER 11 CASES, THE PLAN OR THE DISCLOSURE STATEMENT AGAINST THE FOLLOWING PERSONS IN THEIR RESPECTIVE CAPACITIES AS SUCH (THE "THIRD PARTY RELEASEES"): (I) THE CURRENT DIRECTORS, OFFICERS AND EMPLOYEES OF THE DEBTORS; (II) ANY FORMER DIRECTORS AND OFFICERS OF THE DEBTORS WHO WERE FIRST APPOINTED AFTER THE PETITION DATE; (III) THE DEBTORS' PROFESSIONALS, AND THEIR RESPECTIVE AFFILIATES AND CURRENT AND FORMER OFFICERS, PARTNERS, DIRECTORS, EMPLOYEES, AGENTS, MEMBERS, SHAREHOLDERS, ADVISORS (INCLUDING ANY ATTORNEYS, FINANCIAL ADVISORS, INVESTMENT BANKERS AND OTHER PROFESSIONALS RETAINED BY SUCH PERSONS); (IV) THE DIP AGENT AND THE DIP LENDERS, AND PROFESSIONALS OF THE FOREGOING; AND (V) THE COMMITTEE AND ITS CURRENT OR FORMER MEMBERS, AND THEIR RESPECTIVE AFFILIATES AND CURRENT AND FORMER OFFICERS, PARTNERS, DIRECTORS, EMPLOYEES, AGENTS, SHAREHOLDERS, ADVISORS (INCLUDING ANY ATTORNEYS, FINANCIAL ADVISORS, AND OTHER PROFESSIONALS RETAINED BY SUCH PERSONS) LIMIT TO CAPACITY AS COMMITTEE MEMBERS. NOTWITHSTANDING THE FOREGOING, IN NO EVENT SHALL) ANYTHING IN SECTION 11.07 OF THE PLAN BE CONSTRUED AS A RELEASE OF ANY PERSON'S (OTHER THAN A DEBTOR'S) FRAUD OR WILLFUL MISCONDUCT.

NOTWITHSTANDING ANYTHING TO THE CONTRARY: (I) EXCEPT TO THE EXTENT PERMISSIBLE UNDER APPLICABLE LAW, AS SUCH LAW MAY BE EXTENDED OR INTERPRETED SUBSEQUENT TO THE EFFECTIVE DATE, THE RELEASES PROVIDED FOR IN SECTION 11.07 OF THE PLAN SHALL NOT RELEASE ANY NON-DEBTOR ENTITY FROM ANY LIABILITY ARISING UNDER: (X) THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, OR ANY STATE, CITY OR MUNICIPAL TAX CODE; (Y) THE ENVIRONMENTAL LAWS OF THE UNITED STATES OR ANY STATE, CITY OR MUNICIPALITY; OR (Z) ANY CRIMINAL LAWS OF THE UNITED STATES OR ANY STATE, CITY OR MUNICIPALITY; AND (II) THE RELEASES PROVIDED IN SECTION 11.07 OF THE PLAN SHALL NOT RELEASE ANY NON-DEBTOR ENTITY FROM ANY LIABILITY ARISING UNDER THE SECURITIES LAWS OF THE UNITED STATES. NOTHING IN THE PLAN OR THE CONFIRMATION ORDER APPROVING THE PLAN SHALL RELEASE, DISCHARGE, ENJOIN, OR PRECLUDE THE ENFORCEMENT OF ANY ENVIRONMENTAL LIABILITY ARISING POST-EFFECTIVE DATE OR ARISING FROM AN EVENT THAT OCCURRED PRIOR TO THE EFFECTIVE DATE WHERE THE LIABILITY CONTINUES POST-EFFECTIVE DATE TO A GOVERNMENTAL UNIT TO WHICH ANY ENTITY WOULD BE SUBJECT AS THE OWNER OR OPERATOR OF PROPERTY AFTER THE EFFECTIVE DATE.

NOTWITHSTANDING ANYTHING OTHERWISE TO THE CONTRARY, NO PROVISION OF THE PLAN OR OF THE CONFIRMATION ORDER, INCLUDING ANY RELEASE OR EXCULPATION PROVISION, SHALL MODIFY, RELEASE OR OTHERWISE LIMIT THE LIABILITY OF ANY PERSON NOT SPECIFICALLY RELEASED UNDER THE PLAN, INCLUDING ANY PERSON THAT IS A CO-OBLIGOR OR JOINT TORTFEASOR OF A RELEASED PARTY OR THIRD PARTY

**RELEASEE, THAT OTHERWISE IS LIABLE UNDER THEORIES OF VICARIOUS OR OTHER DERIVATIVE LIABILITY.**

### 9.8 Exculpation

None of the Purchaser (in its capacity as a purchaser under the Purchase Agreement), the Debtors, the Reorganized Debtor, the DIP Agent (in its capacity as such), the DIP Lenders (in their capacity as such), the Committee, the Post-Confirmation Oversight Committee, or any of their respective current or former members, partners, officers, directors, employees, advisors, professionals, affiliates, or agents and advisors of any of the foregoing (including any attorneys, financial advisors, investment bankers and other professionals retained by such Persons, but solely in their capacities as such) shall have or incur any liability to any holder of any Claim or Equity Interest for any act or omission in connection with, related to, or arising out of the Chapter 11 Cases, the negotiation and execution of the Plan, the Disclosure Statement, the Purchase Agreement and Sale Transactions, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan, the Purchase Agreement, the Sale Transactions and the property to be distributed under the Plan, including all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all prepetition activities leading to the promulgation and confirmation of the Plan except fraud, willful misconduct or gross negligence as determined by a Final Order. Nothing in Section 11.08 of the Plan shall: (i) be construed as a release of any entity's fraud, gross negligence or willful misconduct with respect to matters set forth in Section 11.08 of the Plan; (ii) limit the liability of attorneys for the Debtors, the Reorganized Debtor, the Committee, or the Post-Confirmation Oversight Committee to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility; or (iii) limit or abrogate the obligations of the Debtors or the Purchaser and any of their respective affiliates to one another under the Sale Transaction Documents or the Purchase Agreement.

### 9.9 Injunction

**THE CONFIRMATION ORDER SHALL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIMS (EXCEPT FOR ASSUMED LIABILITIES), OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION OR LIABILITIES RELEASED PURSUANT TO THE PLAN, INCLUDING THE CLAIMS (EXCEPT FOR ASSUMED LIABILITIES), OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION OR LIABILITIES RELEASED IN SECTIONS 11.07 AND 11.08 OF THE PLAN.**

### 9.10 Release of Liens and Encumbrances

Each Lien or encumbrance on the Debtors' assets, other than a permitted encumbrance (excluding a permitted encumbrance securing a financial obligation that is not an Assumed Liability), including Liens or encumbrances securing: (w) any DIP Loan Agreement Claim, Secured Tax Claim or Other Secured Claim; (x) any Claim that is purportedly secured or (y) any judgment, personal property or ad valorem tax, or other tax of any kind or character, mechanic's

or similar lien Claim, in each case regardless of whether such Claim is an Allowed Claim, shall, regardless of whether such Claim has been scheduled or proof of such Claim has been filed:

(i)    if such Lien or encumbrance is on an Excluded Asset and secures a Secured Tax Claim or Other Secured Claim, such Lien or encumbrance shall upon payment of the consideration set forth in Section 4.02 or 4.03 of the Plan, as the case may be, automatically, and without further action by the Debtors or the Reorganized Debtor, be deemed released;

(ii)    in all other cases, such Lien or encumbrance shall automatically, and without further action by the Debtors or the Reorganized Debtor, be deemed released immediately upon the occurrence of the Effective Date; provided, however, that in the case of Purchased Assets, any Lien or encumbrance in favor of the holder of a DIP Loan Agreement Claim, Secured Tax Claim or Other Secured Claim shall automatically attach (in the same order of priority as existed with respect to such Claim and/or Lien, and subject to any rights, Claims or defenses the Debtors or Reorganized Debtor may have with respect to such Claim and/or Lien) to the net proceeds of the sale of the property that secured such Claim until such time as such DIP Loan Agreement Claim, Secured Tax Claim or Other Secured Claim is satisfied as set forth in Section 2.01, 4.02 or 4.03 of the Plan, as applicable, at which time such Claim and/or Lien or encumbrance shall automatically, and without further action by the Debtors or Reorganized Debtor, be deemed released; and

(iii)    the holder of any such Lien or encumbrance shall execute such documents and instruments as the Plan Administrator, the Reorganized Debtor, or, with respect to Purchased Assets, the Purchaser, as the case may be, require to evidence such Claim holder's release of such property or Lien or encumbrance, and if such holder refuses to execute appropriate documents or instruments, the Debtors, the Plan Administrator, or the Reorganized Debtor (as applicable) or Buyer may, in their discretion, file a copy of the Confirmation Order in the appropriate recording office, which shall serve to release any Claim holder's rights in such property; and

(iv)    on the Effective Date, except as expressly provided in the Plan, all right, title and interest in Estate property subject to a Lien or an encumbrance immediately prior to the Effective Date shall revert or be transferred to the respective Reorganized Debtor.

## ARTICLE 10
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**10.1** **Assumption or Rejection of Executory Contracts and Unexpired Leases**

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code:

      (a) all executory contracts and unexpired leases of the Debtors shall be deemed to be rejected by the applicable Debtor as of the Effective Date, except for any executory contract or unexpired lease: (a) that previously has been assumed and/or assigned pursuant to an order of the Bankruptcy Court entered prior to the Effective Date; (b) as to which a motion for approval of the assumption and/or assignment of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date; or (c) that is specifically designated as a contract or lease to be assumed and/or assigned or retained on Schedule 10.01(a), which schedule shall be contained in the Plan Supplement and shall list corresponding Cure Amounts;

      (b) notwithstanding anything otherwise set forth in the Plan to the contrary, the Debtors reserve the right, on or prior to the Effective Date, to amend Schedule 10.01(a) to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, as applicable, rejected, assumed and/or assigned or retained. The Debtors shall provide notice of any amendments to Schedule 10.01(a) to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on Schedule 10.01(a) shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejections, retentions, assumptions and/or assignments contemplated by the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed pursuant to Section 10.01(a) of the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law. The Debtors reserve the right to file a motion on or before the Confirmation Date to assume or reject any executory contract or unexpired lease.

**10.2** **Cure of Defaults**

Except as may otherwise be agreed to by the Debtors or Reorganized Debtor, as the case may be, and the non-Debtor party to the contract or lease, within thirty (30) days after the Effective Date, the Reorganized Debtor shall cure any and all undisputed defaults under any executory contract or unexpired lease assumed by the Debtors pursuant to the Plan, in accordance with Bankruptcy Code section 365(b). Subject to the last sentence of Section 10.02(b) of the Plan, all disputed defaults that are required to be cured shall be cured either

within thirty (30) days of the entry of a Final Order determining the amount, if any, of the Reorganized Debtor's liability with respect thereto, or as may otherwise be agreed to by the parties.

The Debtors shall, prior to the conclusion of the Confirmation Hearing, file and serve on parties to executory contracts and unexpired leases that may be assumed pursuant to Section 10.01 of the Plan a notice (the "Cure Notice") listing the proposed Cure Amount to be paid in connection with the executory contracts and unexpired leases that may be Assumed, retained, assumed and/or assigned pursuant to Section 10.01 of the Plan. The non-Debtor parties to such contracts and leases shall have until fifteen (15) days following service of the Cure Notice to object in writing to the proposed cure and to propose an alternative cure. In the event that no objection is timely filed, the applicable party shall be deemed to have consented to the cure proposed by the Debtors (including amounts of compensation for actual pecuniary loss) and shall be forever enjoined and barred from seeking from the Debtors, and Reorganized Debtor any additional amount on account of the Debtors' cure obligations under section 365 of the Bankruptcy Code. If an objection is timely filed with respect to the Cure Amount proposed by the Debtors for an executory contract or unexpired lease, the Bankruptcy Court shall hold a hearing to determine the amount of any disputed cure amount not settled by the parties. Notwithstanding anything otherwise to the contrary, at all times through the date that is thirty (30) days after the entry of a Final Order resolving and fixing the amount of a disputed cure amount, whether such date is before or after the Effective Date, the Debtors and Reorganized Debtor shall be authorized to reject such executory contract or unexpired lease by notice to the non-debtor party to such executory contract or unexpired lease.

### 10.3 Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan

Claims arising out of the rejection of an executory contract or unexpired lease pursuant to Section 10.01 of the Plan must be filed with the Bankruptcy Court and served upon the Debtors or, on and after the Effective Date, the Reorganized Debtor, no later than thirty (30) days after the later of: (i) notice of entry of an order approving the rejection of such executory contract or unexpired lease; (ii) notice of occurrence of the Effective Date; and (iii) notice of an amendment to Schedule 10.01(a) amending any such Claim. All such Claims not filed within such time will be forever barred from assertion against the Debtors and their estates, and the Reorganized Debtor.

## ARTICLE 11
## ACCEPTANCE AND CONFIRMATION OF THE PLAN

### 11.1 Introduction

The Bankruptcy Code requires the bankruptcy court to determine whether a plan of reorganization complies with the technical requirements of chapter 11 of the Bankruptcy Code. It requires further that a debtor's disclosures concerning such plan have been adequate and have included information concerning all payments made or promised by the debtor in connection with the plan.

To confirm the Plan, the Court must find that all of these and other requirements have been met. Thus, even if the requisite vote is achieved for each Class of impaired Claims, the Court must make independent findings respecting the Plan's conformity with the requirements of the Bankruptcy Code before it may confirm the Plan. Some of these statutory requirements are discussed below.

If the Plan is confirmed, the Debtors expect the Effective Date to occur not later than 30 days after the Confirmation Date.

## 11.2   Acceptance of the Plan

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of claims of that class that actually vote. Acceptance of the Plan need only be solicited from holders of Claims whose Claims are "impaired" and not deemed to have rejected the Plan. See Section 3.2 ("Holders of Claims Entitled to Vote") above. Except in the context of a "cram down," as a condition to confirmation of the Plan, the Bankruptcy Code requires that, with certain exceptions, each Class of impaired Claims accepts the Plan.

In the event the requisite vote is not obtained, the Debtors and Committee have the right, assuming that at least one Class of impaired Claims has accepted the Plan, to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) permits confirmation of a plan notwithstanding rejection by one or more classes of impaired claims or impaired interests if the bankruptcy court finds that the plan does not discriminate unfairly and is "fair and equitable" with respect to the rejecting class or classes. This procedure is commonly referred to in bankruptcy parlance as "cram down." For a more detailed description of the requirements for acceptance of the Plan and of the criteria for confirmation of the Plan notwithstanding rejection by certain impaired Classes, see Section 11.3(d) ("Cram Down") below. The Plan is predicated on all Voting Classes voting to accept the Plan. However, if any Voting Classes vote to reject the Plan, the Debtors and Committee may request a cram down of such Classes at the Confirmation Hearing. In any event, the Debtors will seek a cram down of the Plan on Classes deemed to reject the Plan by virtue of receiving no Distributions thereunder.

## 11.3   Confirmation and Consummation

### (a)   Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the bankruptcy court, after notice, to hold a hearing on confirmation of a plan. Notice of the Confirmation Hearing regarding the Plan has been provided to all known holders of Claims and Equity Interests or their respective representatives along with this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

**(b)    Objection to Confirmation**

Section 1128(b) of the Bankruptcy code provides that any party in interest may object to confirmation of a plan.  Any objection to Confirmation of the Plan must be in writing, must conform with the Bankruptcy Rules and the Local Rules of the Bankruptcy Court, must set forth the name of the objecting party, the nature and amount of Claims or Equity Interests held or asserted by that party against the Debtor's Estate or property, and the specific basis for the objection.  Such objection must be filed with the Bankruptcy Court, with a copy forwarded directly to the chambers of the Honorable Peter J. Walsh, together with a proof of service, and served on all parties by the date set forth on the Confirmation Hearing Notice.

**(c)    Statutory Requirements for confirmation of the Plan**

At the Confirmation Hearing, the Debtor will request that the Bankruptcy Court determine that the plan satisfies the requirements of Section 1129 of the Bankruptcy Code.  If the Bankruptcy Court so determines, the Bankruptcy court will enter an order confirming the Plan.  The applicable requirements of Section 1129 of the Bankruptcy code are as follows:

**(i)**    The Plan must comply with the applicable provisions of the Bankruptcy Code;

**(ii)**    The Proponents of the Plan must have complied with the applicable provisions of the Bankruptcy Code;

**(iii)**    The Plan must have been proposed in good faith and not by any means forbidden by law;

**(iv)**    Any payment made or promised to be made by the Debtors under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan, must have been disclosed to the Bankruptcy Court, and any such payment made before Confirmation of the Plan must be reasonable, or if such payment is to be fixed after Confirmation of the Plan such payment must be subject to the approval of the Bankruptcy Court as reasonable;

**(v)**    The Proponents of the Plan must have disclosed the identity and affiliates of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors under the Plan, an affiliate participating in the Plan with the Debtors, or a successor to the Debtors under the Plan.  Moreover, the appointment to, or continuance in, such office of such individual, must be consistent with the interests of holders of Claims and Equity Interests and with public policy, and the Debtors must have disclosed the identity of any insider that the Reorganized Debtor if any will employ or retain, and the nature of any compensation for such insider;

**(vi)**    With respect to each Class of impaired Claims or Equity Interests, either each holder of a Claim or Equity Interest, of such Class

must have accepted the Plan, or must receive or retain under the Plan on account of such Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated on such date under Chapter 7 of the Bankruptcy Code. In a Chapter 7 liquidation, creditors and interest holders of a debtor are paid from available assets generally in the following order, with no lower class receiving any payments until all amounts due to senior classes have either been paid in full or payment in full is provided for: (i) first to secured creditors (to the extent of the value of the collateral); (ii) next to priority creditors; (iii) next to unsecured creditors; (iv) next to debt expressly subordinated by its terms or by order of the bankruptcy court; and (v) last to holder of equity interest. Attached as Exhibit B to this Disclosure Statement is a liquidation analysis prepared by the Debtors' restructuring consultants, which indicates that, in light of the foregoing priority scheme, if the Chapter 11 Cases were converted to a Chapter 7 liquidation, holders of Allowed Claims and Equity Interests would receive less than they will receive under the Plan;

**(vii)** Each Class of Claims or Equity Interests must have either accepted the Plan or not be impaired under the Plan;

**(viii)** Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provided that Allowed Administrative Expense and Priority Claims (other than Allowed Priority Tax Claims) will be paid in full on the Effective Date and that Allowed Priority Tax Claims either will be paid in full or receive on account of such Claims deferred Cash payments, over a period not exceeding five years after the Petition Date equal to the value of the Allowed amount of such Claim;

**(ix)** At least one impaired Class of Claims must have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such Class; and

**(x)** Confirmation of the Plan must not be likely followed by the liquidation, or the need for further financial reorganization of the Debtors or any successor to the Debtor under the Plan unless such is specifically provided for under the Plan.

Subject to receiving the requisite votes in accordance with Section 1129(a)(8) of the Bankruptcy Code and the "Cram Down" of Classes not receiving any distribution under the Plan, the Debtors and Committee believe that: (i) the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtors and Committee have compiled or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.

### (d)     Cram Down

**THE DEBTORS AND COMMITTEE RESERVE THE RIGHT TO CRAM DOWN THE PLAN ON HOLDERS OF IMPAIRED CLAIMS OR INTERESTS.**

The Bankruptcy Code contains provisions for confirmation of a plan even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted the Plan. The "cram down" provisions of the Bankruptcy Code are set forth in section 1129(b) of the Bankruptcy Code. Under the "cram down" provisions, upon the request of a plan proponent, the bankruptcy court will confirm a plan despite the lack of acceptance by an impaired class or classes if the bankruptcy court finds that: (i) the plan does not discriminate unfairly with respect to each non-accepting impaired class; (ii) the plan is fair and equitable with respect to each non-accepting impaired class; and (iii) at least one impaired class has accepted the plan. These standards ensure that holders of junior interests, such as common shareholders, cannot retain any interest in the debtor under a plan of reorganization that has been rejected by a senior class of impaired claims or interests unless such impaired claims or interests are paid in full.

As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have narrow and specific meanings unique to bankruptcy law. A plan does not discriminate unfairly if claims or interests in different classes but with similar priorities and characteristics receive or retain property of similar value under a plan. By establishing separate Classes for the holders of each type of Claim and by treating each holder of a Claim in each Class similarly, the Plan has been structured so as to meet the "unfair discrimination" test of section 1129(b) of the Bankruptcy Code.

The Bankruptcy Code sets forth different standards for establishing that a plan is "fair and equitable" with respect to a dissenting class, depending on whether the class is comprised of secured or unsecured claims or interests. In general, section 1129(b) of the Bankruptcy Code permits confirmation, notwithstanding non-acceptance by an impaired class, if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before a junior class may receive anything under the plan. Case law surrounding section 1129(b) requires that no class senior to a non-accepting impaired class receives more than payment in full on its claims. Here, the holders of Allowed First Lien Credit Agreement Claims, have agreed, subject to the terms of the 9019 Settlement, to waive their right to receive distributions on account of their Allowed Claims and redistribute the amounts the holders thereof would otherwise receive under the Plan to holders of Allowed General Unsecured Claims in Class 5, which is permissible under applicable case law. See, e.g., See In re World Health Alternatives, Inc., 344 B.R. 291, 297 (Bankr. D. Del. 2006) (approving sharing agreement as valid); Official Comm. of Unsecured Creditors v. Stern (In re SPM Mfg. Corp.), 984 F.2d 1305 (1st Cir. 1993) (same); In re Genesis Health Ventures, Inc., 266 B.R. 591 (Bankr. D. Del. 2001) (same); In re MCorp Fin., Inc., 160 B.R. 941 (S.D. Tex. 1993) (same). Accordingly the Plan is fair and equitable.

With respect to a Class of unsecured Claims that does not accept the Plan, the Debtors must demonstrate to the Court that either: (i) each holder of an unsecured Claim in the dissenting Class receives or retains under such Plan property of a value equal to the allowed amount of its

unsecured Claim; or (ii) the holders of Claims or holders of Interests that are junior to the Claims of the holders of such unsecured Claims will not receive or retain any property under the Plan. Additionally, the Debtors must demonstrate that the holders of Claims that are senior to the Claims of the dissenting Class of unsecured Claims receive no more than payment in full on their Claims under the Plan. If the Class of General Unsecured Claims or Insurance Claims votes to reject the Plan, the Plan is nevertheless designed to satisfy these standards, as the holders of Equity Interests will receive no recovery under the Plan.

If all the applicable requirements for confirmation of the Plan are met as set forth in sections 1129(a)(1) through (13) of the Bankruptcy Code, except that one or more Classes of impaired Claims have failed to accept the Plan pursuant to section 1129(a)(8) of the Bankruptcy Code, the Debtors and Committee will request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code. The Debtors and Committee believe that the Plan satisfies the "cram down" requirements of the Bankruptcy Code. The Debtors and Committee may seek confirmation of the Plan over the objection of dissenting Classes, as well as over the objection of individual holders of Claims who are members of an accepting Class. In addition, the Debtors and Committee intend to seek "cram down" of the Plan on Classes deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code by virtue of receiving no Distributions thereunder. However, there can be no assurance that the Court will determine that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code.

### (e) Classification of Claims and Interests

The Debtors and Committee believe that the Plan meets the classification requirements of the Bankruptcy Code which require that a plan of reorganization place each claim or interest into a class with other claims or interests which are "substantially similar."

### 11.4 Amendment or Modification of the Plan

Alterations, amendments, or modifications of or to the Plan (including to provide for treatment different than that set forth in the Plan with respect to any class of Claims or Equity Interests, including establishment of subclasses of Classes of Claims or Equity Interests to the extent required if so elected by the Debtors or if the deemed consolidation contemplated by Article V of the Plan is not approved, the unimpairment of Classes that are impaired hereunder, and the impairment of Classes that are unimpaired hereunder) may be proposed in writing by the Debtors at any time prior to the Confirmation Date, provided that the Plan, as altered, amended, or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Proponents shall have complied with section 1125 of the Bankruptcy Code. Subject to any applicable restrictions or requirements on the Debtors under the Purchase Agreement, the Plan may be altered, amended, or modified at any time after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended, or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended, or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments, or modifications. A holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, or modified, if the proposed alteration,

amendment, or modification does not materially and adversely change the treatment of the Claim or Equity Interest of such holder.

**11.5    Revocation or Withdrawal of the Plan**

The Debtors and the Committee mutually reserve the right to revoke or withdraw the Plan prior to the Effective Date in whole or in part. If the Debtors and the Committee revoke or withdraw the Plan prior to the Effective Date, then except as set forth in Section 14.08 of the Plan, the Plan shall be deemed null and void. In the event of any such waiver or revocation, nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

# ARTICLE 12
# THE CONTINUED EXISTENCE OF THE DEBTORS

**12.1    The Plan Administrator**

### (a)    General

#### (i)    Appointment and Duties

Not less than ten (10) days prior to the commencement of the Confirmation Hearing and subject to Bankruptcy Court approval in connection with confirmation of the Plan, the Committee shall designate the Person who initially will serve as the Plan Administrator, provided, however, that: (i) the Committee shall have the right at any time prior to the Effective Date to remove the Plan Administrator without cause; and (ii) the Plan Administrator shall be subject to removal by the Bankruptcy Court for cause shown at any time. On or after the Confirmation Date but prior to the Effective Date, the Plan Administrator shall assume all of its obligations, powers and authority under the Plan to: (i) establish reserves as set forth in Section 7.02; and (ii) exercise such other power and authority as may be set forth in the Confirmation Order (collectively, the "Pre-Effective Date PA Duties"). On the Effective Date, the Plan Administrator shall assume all of its other obligations, powers and authority under the Plan

#### (ii)    Qualifications; Plan Administrator Agreement

The Plan Administrator shall be a fiduciary of each of the Debtors and the Debtors' estates, shall have such qualifications and experience as are sufficient to enable the Plan Administrator to perform its obligations under the Plan and under the agreement to be entered into by the Plan Administrator and the Committee or its successor, the Post-Confirmation Oversight Committee (the "Plan Administrator Agreement"), and shall be compensated and reimbursed for expenses as set forth in, and in accordance with, the Plan Administrator Agreement.

The Plan Administrator Agreement and the Confirmation Order shall provide that: (i) the Plan Administrator (x) prior to the Effective Date, shall be independent of the Debtors and shall report to the Committee or its successor, the Post-Confirmation Oversight Committee, with respect to the Plan Administrator's obligations under the Plan; and (y) shall be a fiduciary of

each of the Estates; **(ii) neither the Debtors (except as expressly set forth in the Plan Administrator Agreement) nor their respective boards of directors, managements, employees and professionals shall have any liability for any action taken or omitted to be taken by the Plan Administrator in performing the Pre-Effective Date PA Duties and all Persons are enjoined from pursuing any Claims against the foregoing pursuant to this Plan on account of any such action taken or omitted to be taken)**; (iii) any determinations made by the Plan Administrator with respect to the establishment of reserves under this Plan shall not be binding on any party if the Effective Date fails to occur; and (iv) if the Plan is withdrawn or otherwise abandoned prior to the occurrence of the Effective Date, the Plan Administrator position shall thereafter be dissolved.

### (b) Powers and Duties.

#### (i) General

From and after the Effective Date, pursuant to the terms and provisions of this Plan, the Plan Administrator shall be empowered and directed to: (i) take all steps and execute all instruments and documents necessary to make Distributions to holders of Allowed Claims and to perform the duties assigned to the Plan Administrator under this Plan or the Plan Administrator Agreement; (ii) comply with the Plan and the obligations thereunder; (iii) employ, retain, or replace professionals to represent it with respect to its responsibilities; (iv) object to Claims as provided in the Plan, and prosecute such objections; (v) compromise and settle any issue or dispute regarding the amount, validity, priority, treatment, or Allowance of any Claim; (vi) establish, replenish or release reserves as provided in the Plan, as applicable; (vii) exercise such other powers as may be vested in the Plan Administrator pursuant to the Plan, the Plan Administrator Agreement or any other Plan Documents or order of the Bankruptcy Court or otherwise act on behalf of and for the Reorganized Debtor from and after the Effective Date; (viii) take all actions necessary or appropriate to enforce the Debtors' rights under the Sale Transaction Documents; (ix) make all determinations on behalf of the Debtors under the Purchase Agreement; (x) file applicable tax returns for any of the Debtors or the Reorganized Debtor; and (xi) liquidate any of the Excluded Assets. The Plan Administrator may retain legal counsel and financial advisors to advise it in the performance of its duties. The Reorganized Debtor shall pay the reasonable fees and expenses of the professional persons employed by the Plan Administrator (the "Plan Administrator Professional Fees") in connection with its duties and responsibilities as set forth in this Plan. The Plan Administrator Professional Fees shall be paid within ten (10) Business Days after submission of a detailed invoice therefor to the Reorganized Debtor. If the Reorganized Debtor disputes the reasonableness of any such invoice, the Reorganized Debtor or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved. The undisputed portion of such reasonable fees and expenses shall be paid as provided herein.

#### (ii) Distributions.

Pursuant to the terms and provisions of the Plan, the Plan Administrator shall make the required Distributions specified under the Plan, on the Initial Distribution Date, Interim Distribution Date, or Final Distribution Date, as the case may be, under the Plan.

(iii)     Disputed Reserves.

On the Effective Date, the Debtors shall transfer to the Plan Administrator all assets held in each of the reserves being held by Debtors, including reserves for Disputed Claims, and the Plan Administrator shall establish reserves, holdbacks and funds required by the Plan.

(iv)     Reorganized Debtor Stock.

On the Effective Date, the Reorganized Debtor shall issue a single share of stock to the Plan Administrator.

### 12.2     Procedures for Treating Disputed Claims

(a)     **Objections to Administrative Expense Claims and Claims**

Following the Effective Date, only the Reorganized Debtor shall be entitled to object to Administrative Expense Claims and Claims. Any objections to Administrative Expense Claims and Claims shall be filed and served on or before the later of: (i) ninety (90) days after the Effective Date; and (ii) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing, which later date may be fixed before or after the date specified in clause (i) above. No objection shall be required with respect to a proof of Claim or proof of Administrative Expense Claim filed after the applicable Bar Date, and any and all such Claims and Administrative Expense Claims shall be deemed disallowed unless otherwise ordered by the Bankruptcy Court after notice and a hearing.

(b)     **Amendments to Claims**

After the Confirmation Date, a proof of Claim or Administrative Expense Claim may not amended without the authorization of the Bankruptcy Court. Any new proof of Claim or Administrative Expense Claim amended after the Confirmation Date shall be deemed disallowed in full and expunged without any action by the Debtors or the Reorganized Debtor, unless the holder of the Claim or Administrative Expense Claim has obtained prior Bankruptcy Court authorization to file the amendment.

(c)     **No Distributions Pending Allowance**

Notwithstanding any other provision hereof, if any portion of a Claim or Administrative Expense Claim is Disputed, no payment or distribution provided hereunder shall be required to be made on account of such Claim or Administrative Expense Claim unless and until such Disputed Claim or Administrative Expense Claim becomes Allowed in its entirety.

(d)     **Distributions Relating to Insurance Claims**

Distributions under the Plan to each holder of an Insurance Claim shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in Section 9.04 of the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any entity may hold against any other entity, including, without limitation, insurers under any policies of

insurance, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers. To the extent an Insurance Claim, in whole or in part, becomes liquidated: (i) the insured portion shall be paid by the applicable insurer; and (ii) to the extent any portion of such liquidated Insurance Claim is not covered by any of the Debtors' insurance policies, such uninsured portion shall be deemed, to the extent applicable, a Class 6 Claim and shall be treated in accordance with Section 4.06 of the Plan. Nothing contained in Section 9.04 of the Plan shall constitute or be deemed a waiver of any defense, right, or Cause of Action that the Debtors may have against any Person in connection with or arising out of any Insurance Claim.

### (e) Resolution of Disputed Claims

On and after the Effective Date, the Reorganized Debtor and the Plan Administrator shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Disputed Claims without approval of the Bankruptcy Court; provided, however, the Reorganized Debtor and the Plan Administrator shall not be permitted to compromise, settle or otherwise resolve any objections to Disputed Claims absent approval by the Post-Confirmation Oversight Committee pursuant to procedures to be agreed upon between the Post-Confirmation Oversight Committee and the Plan Administrator. To the extent that there is no Post-Confirmation Oversight Committee, the Reorganized Debtor or the Plan Administrator shall file with the Court a quarterly report regarding claims resolved over a certain threshold amount to be agreed upon between the Reorganized Debtors and the Committee. The Reorganized Debtor shall be responsible for paying the reasonable fees and expenses (including reasonable attorneys' fees and costs) that are incurred by the Debtors, the Reorganized Debtor, and the Plan Administrator and associated with the claims resolution process.

### (f) Resolution of Disputed Insurance Claims

All Insurance Claims not previously Allowed shall be considered to be Disputed Claims as of the Effective Date such that no objection to an Insurance Claim is required to be filed. The Reorganized Debtor shall have the right to the exclusion of all others to make, file, and prosecute objections to Insurance Claims in a forum of appropriate jurisdiction. All Insurance Claims shall be litigated to an order of a court of competent jurisdiction over such claim except to the extent that the Reorganized Debtor and the holder of the Disputed Insurance Claim compromise, settle or otherwise resolve the respective Insurance Claim or agree to another method of claim resolution such as mediation or arbitration, in which event they may settle, compromise or otherwise resolve any Disputed Claim without further order of the Bankruptcy Court or any other court; provided, however, that the Reorganized Debtor shall not be permitted to compromise, settle, or otherwise resolve any objections to Disputed Claims absent approval by the Post-Confirmation Oversight Committee pursuant to procedures to be agreed upon between the Post-Confirmation Oversight Committee and the Plan Administrator.

### 12.3 Post-Confirmation Jurisdiction of the Court

The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(i)     To hear and determine pending applications for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases and the allowance of cure amounts and Claims resulting therefrom or from the assumption, assumption and assignment or rejection of executory contracts or unexpired leases pursuant to the Plan;

(ii)     To hear and determine any and all adversary proceedings, applications, and contested matters, and to order appropriate relief in connection therewith (including issuance and/or enforcement of releases);

(iii)     To hear and determine any objection to Administrative Expense Claims, Claims or Equity Interests;

(iv)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(v)     To issue such orders in aid of execution and consummation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(vi)     To consider any amendments to, or modifications of, the Plan and the Plan Supplement, and any dispute or controversy relating to execution, delivery or compliance with any document included in the Plan Supplement, and to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(vii)     To issue such orders in aid of execution and consummation of any Sale Transaction to be consummated in connection with the Plan;

(viii)     To hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331, and 503(b) of the Bankruptcy Code;

(ix)     To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan;

(x)     To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, any Sale Transaction to be consummated in accordance herewith, the Confirmation Order, or any other order of the Bankruptcy Court;

(xi)     To recover all assets of the Debtors and property of the Debtors and Reorganized Debtor, wherever located;

(xii) To hear and determine matters concerning state, local, and federal taxes, including as provided by sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of tax under section 505(b) of the Bankruptcy Code);

(xiii) To resolve any Disputed Claims or Equity Interests;

(xiv) To determine the scope of any discharge of any Debtor under the Plan or the Bankruptcy Code;

(xv) To hear any other matter not inconsistent with the Bankruptcy Code; and

(xvi) To enter a final decree closing the Chapter 11 Cases; provided, however, with respect to a governmental unit's exercise of its police or regulatory powers other than the enforcement of a money judgment, the jurisdiction of any other tribunal shall not be reduced or impaired from that as set forth in any applicable, valid statutory grant of jurisdiction.

If the Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, then Section 13.01(a) of the Plan will have no effect upon and will not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE 13
## CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED HEREIN BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### 13.1 Risk that Distributions will be Less Than Estimated by Debtors

A substantial amount of time may elapse between the Effective Date and the receipt of a final Distribution under the Plan for certain holders of Claims because: (i) such holders may have substantial and/or complicated Disputed Claims; and (ii) the Debtors' estimate of allowable Claims could be contested at an estimation hearing.

The projected distributions and recoveries set forth in this Disclosure Statement are based on the Debtors' estimates of Allowed Claims. The Debtors project that the Claims asserted against them will be resolved in and reduced to an amount that approximates their estimates. However, there can be no assurance that the Debtors' estimates will prove accurate.

Distributions to creditors also will be affected by the costs of continuing to administer the these cases and wind down the Debtors' businesses.

The Debtors reserve the right to object to the amount or classification of any Claim. Thus, the estimates set forth in this Disclosure Statement cannot be relied upon by any creditor whose Claim is subject to a successful objection. Any such creditor may not receive the estimated Distributions set forth in the Plan.

### 13.2 Litigation Risks

To the extent that Distributions to certain Classes may be derived, in whole or in part, based upon recoveries from causes of action asserted by the Reorganized Debtor, there can be no assurance that any such causes of action will produce recoveries that will enhance the Distributions to be made to holders of Claims under the Plan.

### 13.3 Bankruptcy Risks

#### (a) Objection to Classifications

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Debtors and Committee believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Court will reach the same conclusion.

#### (b) Risk of Nonconfirmation of the Plan

Even if all Classes entitled to vote accept the Plan, the Plan might not be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization unless, as here, such liquidation or reorganization is proposed in the plan, and that the value of distributions to dissenting creditors and equity security holders not be less than the value of distributions such creditors and equity security holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. The Debtors and Committee believe that the Plan satisfies all the requirements for confirmation of a plan of reorganization under the Bankruptcy Code. There can be no assurance, however, that the Court would also conclude that the requirements for confirmation of the Plan have been satisfied. See Article 11 above ("Acceptance and Confirmation of the Plan").

#### (c) Objection to Substantive Consolidation

If the Court were to fail to order the substantive consolidation of the Debtors, administration of the Plan, if still possible, could be substantially more burdensome, time consuming and costly to the Debtors' Estates. Further, pursuant to the Stipulation, discussed in Section 5.6 above, if the Debtors are not substantively consolidated, then the First Lien Lenders' deficiency claim will not be waived and any amount recovered thereunder shall be re-distributed to all eligible holders of general unsecured claims, excluding the second lien lenders. As stated

above, the Debtors and Committee believe that substantive consolidation of the Debtors' Estates will facilitate implementation of the Plan and foster similarity and fairness of treatment of holders of Claims. However, there can be no assurance that the Court would reach the same conclusion.

## ARTICLE 14
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes some of the more significant United States federal income tax consequences of the Plan to certain holders of Claims entitled to vote on the Plan. The analysis contained herein is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), the Treasury Regulations promulgated and proposed thereunder (the "Regulations"), judicial decisions and published administrative rulings and pronouncements of the Internal Revenue Service (the "IRS") as in effect on the date hereof. Legislative, judicial or administrative changes or interpretations hereafter enacted or promulgated could alter or modify the analysis and conclusions set forth below. Any such changes or interpretations may be retroactive and could affect significantly the federal income tax consequences discussed below. This summary does not address foreign, state or local income tax, or any capital income tax or gift tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign companies, nonresident alien individuals, S corporations, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, broker-dealers and tax-exempt organizations). Accordingly, it should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim.

THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE LAW. NO RULING HAS BEEN APPLIED FOR OR OBTAINED FROM THE INTERNAL REVENUE SERVICE WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN REQUESTED OR OBTAINED BY THE PLAN PROPONENT WITH RESPECT THERETO. THIS DISCUSSION DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED. THERE CAN BE NO ASSURANCE THAT THE INTERNAL REVENUE SERVICE WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED. ACCORDINGLY, EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN OR OTHER TAX CONSEQUENCES OF THE PLAN.

TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED BY ANY TAXPAYER, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A

TAXPAYER UNDER THE INTERNAL REVENUE CODE, (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

### 14.1 Federal Income Tax Consequences to the Debtors

#### (a) Sale of Substantially All of the Debtors' Assets

The Debtors sold substantially all of their business assets to the Purchaser on February 20, 2009.

The sales of assets were taxable transactions. Thus, the Debtors must recognize any gain or loss realized on each such sale. The gain or loss realized with respect to each asset is equal to the difference between the selling Debtor's tax basis in such asset and the fair market value of such asset. To the extent that the Debtors recognized a net gain from the asset sales, such gain may be offset either by operating losses that accrue during the current tax year or by the Debtors' net operating loss and/or capital loss carryforwards. The Debtors may, however, recognize some alternative minimum tax as a result of the asset sales if the gain from the sale is offset by net operation losses and/or capital loss carryforwards, and not by operating losses from the current tax year. Any resulting tax will be paid by the Debtors.

#### (b) Cancellation of Indebtedness and Reduction of Tax Attributes

As a result of the consummation of the Plan, certain indebtedness of the Debtors will be discharged. Generally, the Debtors must include in gross income the amount of any such cancellation of indebtedness ("COD") income. The amount of the COD income will equal the amount by which the indebtedness discharged (reduced by any unamortized discount) exceeds any consideration given in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD income (such as where the payment of the cancelled debt would have given rise to a tax deduction). Because the Debtors are in a chapter 11 bankruptcy proceeding, however, the Debtors will not be required to recognize COD income, but must instead reduce certain tax attributes by the amount of unrecognized COD income on the first day of the following tax year in the manner prescribed by section 108(b) of the Tax Code. The tax attributes of the Debtors subject to reduction include net operating losses ("NOLs"), NOL carryforwards, capital losses and loss carryovers, certain tax credits and, subject to certain limitations, the tax basis of property (including stock of subsidiaries). Usually a debtor must reduce its own assets first before then reducing stock of subsidiaries, following which the assets of subsidiaries may be reduced. If the debtor is a member of a consolidated group and reduces its basis in the stock of another group member, a "look-through rule" requires a corresponding reduction in the tax attributes of the lower-tier member. NOLs for the taxable year of the discharge and NOL carryovers to such year generally are the first attributes subject to reduction.

#### (c) Alternative Minimum Tax

The Tax Code provides that, for any taxable year, a corporation's federal income tax liability equals the greater of: (i) the regular tax computed at the regular 35% corporate tax rate

on taxable income; and (ii) the alternative minimum tax ("<u>AMT</u>") computed at a lower tax rate (20%) but on a broader income base (alternative minimum taxable income ("<u>AMTI</u>")). For purposes of computing a corporation's regular federal income tax liability, all of the income recognized in a taxable year may be offset by available NOLs and other tax carryovers (to the extent permitted under, inter alia, sections 382 and 383 of the Tax Code). In contrast, for purposes of computing AMTI, NOLs (as determined for AMT purposes) and other tax carryovers generally are taken into account, but may not offset more than 90% of the pre-NOL AMTI. Thus, a corporation that is currently profitable for AMT purposes generally will be required to pay federal income tax at an effective rate of at least 2% of its pre-NOL AMTI (10% of the 20% AMT tax rate), regardless of the amount of its NOLs. As a result, even if the Debtors are otherwise able to fully shelter their income with NOLs, it will be subject to current taxation in any year in which it has positive net pre-NOL AMTI (including as a result of gain and income recognized in connection with the sale of substantially all of the Debtors' assets and the transactions contemplated by the Plan). To the extent that a corporation's AMT liability for any taxable year exceeds its regular federal income tax liability, the excess may be carried forward as a credit against regular tax liability in subsequent years.

### 14.2  <u>Federal Income Tax Consequences to Holders of Claims</u>

#### (a)  In General

The federal income tax consequences of the Plan to a holder of a Claim will depend upon several factors, including but not limited to: (i) whether the holder's Claim (or a portion thereof) constitutes a Claim for principal or interest; (ii) the origin of the holder's Claim; (iii) whether the holder is a resident of the United States for tax purposes (or falls into any of the special classes of taxpayers excluded from this discussion as noted above); (iv) whether the holder reports income on the accrual or cash basis method; (v) whether the holder has taken a bad debt deduction or worthless security deduction with respect to this Claim; and (vi) whether the holder receives distributions under the Plan in more than one taxable year. HOLDERS ARE STRONGLY ADVISED TO CONSULT THEIR TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OF THEIR PARTICULAR CLAIMS.

Generally, a holder of a Claim will recognize gain or loss equal to the difference between the amount realized by such holder and such holder's adjusted tax basis in the Claim. The amount realized will equal the amount of Cash received under the Plan in respect of a holder's Claim (to the extent that such Cash is not allocable to any portion of the Claim representing accrued but unpaid interest as discussed below).

The character of any recognized gain or loss (*e.g.*, ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the holder, the nature of the Claim in its hands, the purpose and circumstances of its acquisition, the holder's holding period of the Claim, and the extent to which the holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. If the Claim is a capital asset in the holder's hands, any gain or loss realized will generally be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the holder has held such Claim from more than one year. There are limitations on the deduction of capital losses by both corporate and non-corporate taxpayers. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE

RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.

### (b)    Allocation of Consideration to Accrued Interest

A portion of the consideration received by a holder in satisfaction of a Claim pursuant to the Plan may be allocated to the portion of such Claim (if any) that represents accrued but unpaid interest. If any portion of the consideration were required to be allocated to accrued interest, such portion would be taxable to the holder as interest income, except to the extent the holder has previously reported such interest as income. A holder will generally recognize a loss to the extent any accrued interest was previously included in a holder's gross income and is not paid in full.

Pursuant to the Plan, all distributions in respect of any Claim will be allocated first to the principal amount of such Claim, as determined for U.S. federal income tax purposes, and then, to the extent the consideration exceeds such amount, to any portion of such Claim representing accrued but unpaid interest. However, there is no assurance that the IRS would respect such allocation for U.S. federal income tax purposes.

In the event that a portion of the consideration received by a holder of a Claim is treated as accrued but unpaid interest, only the balance of the distribution would be considered received by the holder in respect of the principal amount of the Claim. Such an allocation would reduce the amount of the gain, or increase the amount of loss, realized by the holder with respect to the Claim. If any such loss were a capital loss, it would not offset any amount of the distribution that was treated as ordinary interest income (except, in the case of individuals, to the limited extent that capital losses may be deducted against ordinary income). HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE FEDERAL INCOME TAX TREATMENT OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS.

### (c)    Market Discount

A holder that acquires a debt instrument at a market discount generally is required to treat any gain realized on the disposition of the instrument as ordinary income to the extent of accrued market discount not previously included in gross income by the holder.

### (d)    Information Reporting and Backup Withholding

The Reorganized Debtor (or its paying agent) may be obligated to furnish information to the IRS regarding the consideration received by holders (other than corporations and other exempt holders) pursuant to the Plan.

Holders may be subject to backup withholding on the consideration received pursuant to the Plan. A holder that is not otherwise exempt generally may avoid backup withholding by furnishing to the Reorganized Debtor (or their paying agent) its taxpayer identification number and certifying, under penalties of perjury, that the taxpayer identification number provided is correct and that the holder has not been notified by the IRS that it is subject to backup withholding.

Backup withholding is not an additional tax. Taxpayers may use amounts withheld as a credit against their federal income tax liability or may claim a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

THE FOREGOING IS INTENDED TO BE ONLY A SUMMARY OF CERTAIN OF THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM. ACCORDINGLY, EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES UNDER THE PLAN.

IN ADDITION, THE UNSECURED CREDITOR TRUST IS BEING OR HAS BEEN ESTABLISHED OUTSIDE OF THE PLAN IN ACCORDANCE WITH THE 9019 SETTLEMENT AND 9019 ORDER. ELIGIBLE UNSECURED CREDITORS SHOULD CONSULT WITH THEIR OWN TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES THEREOF.

## ARTICLE 15
## ALTERNATIVES TO PLAN AND CONSEQUENCES OF REJECTION

If the Plan is not timely confirmed, these Chapter 11 Cases may be converted to chapter 7 liquidation proceedings. In a chapter 7 liquidation proceeding, a trustee would be appointed by the Bankruptcy Court to oversee the liquidation of the Debtors' assets. Such trustee would be entitled to retain a new set of professionals, including lawyers and accountants, to review and analyze all of the Claims and the Debtors' assets. In addition, the trustee would be entitled to request a commission on all distributions made to the creditors. The Debtors and the Committee believe that conversion to chapter 7 liquidation proceedings and the appointment of a new trustee and new estate professionals would increase professional fees and result in further delays and a reduction in distributions to the creditors.

Another alternative plan could be pursued by another party-in-interest to the extent that it is allowed by the Bankruptcy Court and the Bankruptcy Code. These plans could be pursued with permission of the Bankruptcy Court or after the Debtors and Committee have failed to gain acceptance of the Plan. Pursuit of multiple plans would be expensive, since the Estates' Professionals would need to evaluate the competing plans and file objections, if appropriate, to one or more competing plans. This would incur a substantial amount of Professional Fees which would ultimately reduce the funds available to repay the Creditors of the Debtors.

The Debtors and Committee believe that the Plan is the best plan that can be proposed and serves the best interests of the Debtors and other parties in interest.

# ARTICLE 16
## GENERAL PROVISIONS

### 16.1    Exemption from Transfer Taxes

Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan (including the transfer of the Purchased Assets in connection with any Sale Transaction), including any merger agreements or agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan, shall constitute a "transfer under a plan" and shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax. All sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Petition Date through and including the Effective Date, including the transfers effectuated under the Plan and the assumption, assignment, and sale by the Debtors of unexpired leases of non-residential real property pursuant to section 365(a) of the Bankruptcy Code, shall be deemed to have been made under, in furtherance of, or in connection with the Plan and, thus, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

### 16.2    Payment of Statutory Fees

On the Effective Date, and thereafter as may be required, the Debtors and/or Reorganized Debtor, as applicable, shall pay all fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code through the entry of a final decree closing the applicable Debtors' cases.

### 16.3    Post-Effective Date Fees and Expenses

From and after the Effective Date, the Reorganized Debtor shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional Persons thereafter incurred by the Reorganized Debtor, including those fees and expenses incurred in connection with the implementation and consummation of the Plan.

### 16.4    Plan Supplement

The Plan Supplement shall contain Schedule 10.01(a) referred to in Section 10.01 of the Plan, the Plan Administrator Agreement and any other appropriate documents, and shall be filed with the Clerk of the Bankruptcy Court at least five (5) Business Days prior to the Voting Deadline; provided, however, that the Proponents may amend: (i) Schedule 10.01(a) through and including the Confirmation Date; and (ii) each of the other documents contained in the Plan Supplement through and including the Effective Date that is not inconsistent with the Plan. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours, www.deb.uscourts.gov (a PACER password is required) or www.kccllc.net/greatwide.

### 16.5 Confirmation Order

The Confirmation Order shall, and is hereby deemed to, ratify all transactions effected by the Debtors during the period commencing on the Petition Date and ending on the Confirmation Date except for any acts constituting willful misconduct, gross negligence, recklessness or fraud.

### 16.6 Severability

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 16.7 Expedited Tax Determination

The Reorganized Debtor may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, such Debtors or Reorganized Debtor for all taxable periods beginning on or before the Effective Date.

### 16.8 Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit or schedule hereto or in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to any contrary result otherwise required under applicable choice or conflict of law rules.

### 16.9 Binding Effect

The Plan shall be binding upon and inure to the benefit of the Debtors, the holders of Claims and Equity Interests, and their respective successors and assigns, including the Reorganized Debtor.

### 16.10 Exhibits/Schedules

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full therein.

### 16.11   Dissolution of the Committee

The functions of the Committee shall terminate on the later of: (i) the Effective Date; and (ii) the conclusion of any appeals with respect to the Confirmation Order (but such functions shall relate solely to services performed related to such appeal), and the Committee shall be deemed dissolved as of such date; provided, however, that following the Effective Date, the attorneys and financial advisors to the Committee shall be entitled to assert any claims for compensation for services rendered or reimbursement for expenses incurred after the Effective Date in connection with the pursuit of their own Fee Claims.

### 16.12   Notices

All notices, requests, and demands to or upon the Debtors, the Reorganized Debtor, the Committee, or the Plan Administrator to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Robert S. Brady
Matthew B. Lunn
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 576-3312

*Co-Counsel for the Debtors*

GW LIMITED 51, Inc., et al.
c/o Loughlin Meghji + Company
Attn: James J. Loughlin, Jr.
220 West 42nd Street, 9th Floor
New York, New York 10036

**PEPPER HAMILTON, LLP**
David B. Stratton
Hercules Plaza
1313 Market Street, Suite 5100
P.O. Box 1709
Wilmington, DE 19899
Telephone: (302) 777-6566
Fax: (302) 421-8390

*Co-Counsel for the Reorganized Debtor*

**WILLKIE FARR & GALLAGHER LLP**
Paul V. Shalhoub
Robin S. Spigel
787 Seventh Avenue
New York, New York 10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111

*Co-Counsel for the Debtors*

**OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C.**
Jenette A. Barrow-Bosshart
Melanie L. Cyganowski
Jessica M. Ward
230 Park Avenue
New York, New York 10169
Telephone: (212) 661-9100
Facsimile: (212) 682-6104

*Co-Counsel for the Reorganized Debtor*

## ARTICLE 17
## CONCLUSION

The Debtors urge holders of impaired Claims to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be received by the Voting Deadline.

Dated: Wilmington, Delaware
      August 19, 2009

**GW Limited 51, Inc., f/k/a GWLS Holdings, Inc., et al.**

By: _____
Name:  James J. Loughlin, Jr.
Title:   Chief Restructuring Officer

On behalf of the Debtors

**The Official Committee of Unsecured Creditors of GW Limited 51, Inc., f/k/a GWLS Holdings, Inc., et al.**

By: _____
Name:
Title:

# ARTICLE 17
## CONCLUSION

The Debtors and Committee urge holders of impaired Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be received by the Voting Deadline.

Dated: Wilmington, Delaware
   August 19, 2009

Respectfully submitted,

GW Limited 51, Inc., f/k/a GWLS Holdings, Inc., <u>et al.</u>
By: _____
Name: James J. Loughlin, Jr.
Title: Chief Restructuring Officer

On behalf of the Debtors

The Official Committee of Unsecured Creditors of GW Limited 51, Inc., f/k/a GWLS Holdings, Inc., <u>et al.</u>, By its Chairperson
Citadel Investment Group LLC
By: _Toby Buchanan_
Name: Toby Buchanan
Title: _Assistant General Counsel_